PIERSKY, APPELLANT, *v.* HOCKING ET AL., RESPONDENTS.

(No. 6,668.)

(Submitted October 4, 1930.   Decided November 6, 1930.)

[292 Pac. 725.]

*Mr. T. B. Wier, Mr. Harry P. Bennett, Mr. J. Miller Smith, Mr. Paul W. Smith* and *Mr. David R. Smith,* for Appellant, submitted a brief; *Mr. Bennett* and *Mr. David R. Smith* argued the cause orally.

*Mr. E. G. Toomey,* for Respondents, submitted a brief and argued the cause orally.

MR. JUSTICE FORD delivered the opinion of the court.

Between 1921 and 1927, plaintiff loaned to defendant Thomas Hocking various sums of money aggregating approximately $2,000. During the months of March and April, 1927, he undertook to procure a mortgage from Hocking to secure the payment of the amount, but without success. On March 12, 1927, Hocking, by warranty deed, conveyed to defendant Sarah Budgen the lands in controversy; the same was recorded in the office of the county clerk on April 6, 1927. On April 11, 1927, plaintiff instituted an action in the district court of Lewis and Clark county against Thomas Hocking and Mary Hocking to recover the amount due and at the same time

procured the issuance of a writ of attachment which was placed in the hands of the sheriff, whose return recited that on April 11 he attached "all the right, title, claim and interest of Thomas Hocking and Mary Hocking in and to" the lands here involved. Thereafter such proceedings were had that on December 14, 1927, judgment was duly given and made in favor of plaintiff and against defendants in that action for $2,238.77, together with costs. A writ of execution was issued on January 14, 1928, and the sheriff made return thereon that "after diligent search I am unable to find any property in the County of Lewis and Clark belonging to said defendants, Thomas Hocking and Mary Hocking, out of which to satisfy said judgment or any part thereof, and said execution is hereby returned wholly unsatisfied." This action was brought to set aside the deed of March 12, 1927, from Thomas Hocking to Sarah Budgen, on the ground of fraud.

The complaint alleges that prior to March 12, 1927, Thomas Hocking and Mary Dunstan, or Mary Hocking, were indebted to plaintiff in the sum of $2,238.77; that an action was commenced against them to recover the amount; that a writ of attachment was duly issued and the lands described attached; that thereafter a judgment was made and entered against the defendants for the amount sued for; that execution was issued upon the judgment and the sheriff made return thereon *nulla bona*; that defendant Thomas Hocking, for the purpose of cheating and defrauding plaintiff, and without consideration, executed a certain deed purporting to convey the lands described to defendant Sarah Budgen, and that Sarah Budgen participated in the fraud practiced by Hocking, and that she in truth and in fact holds the lands in trust for the use and benefit of Hocking's creditors; that the lands so conveyed constituted all of the property and assets of Hocking, and, unless the purported conveyance is set aside, a great and irreparable wrong will be practiced upon plaintiff. Judgment is demanded that the deed to Sarah Budgen be set aside, the property sold under execution and the proceeds applied to the payment of plaintiff's judgment.

Defendants answered, denying all of the allegations of the complaint, save the description of the lands and the execution, delivery and recordation of the deed, and alleging affirmatively that Sarah Budgen purchased the lands for a valuable consideration without knowing, or having reason to know, of any matter or thing adversely affecting the title thereto, or her right and privilege to purchase the same. Issue was joined by reply.

The cause was tried before the court sitting without a jury; findings of fact and conclusions of law were made and filed in favor of defendants; judgment was duly entered thereon, from which plaintiff appeals.

The evidence discloses that between 1921 and 1927 plaintiff, ▮ on numerous occasions, loaned to Hocking various sums of money which was used by him to purchase seed grain and potatoes, groceries, and other necessary supplies for his household, which, until late in 1923, consisted of Thomas Hocking, Mary Dunstan, also known as Mary Hocking, and Richard Dunstan, or Hocking, Mary's son. There is evidence that Richard is the son of Thomas and Mary. For approximately three years prior to 1923 defendant Sarah Budgen, mother of Mary Hocking or Dunstan, had been an inmate of the State Hospital for the Insane; upon her discharge from that institution she, together with her son John, took up their residence with Hocking and lived there with him during the period of the loans by plaintiff, except for temporary absences. Plaintiff testified that after her return, Hocking said, ''Well, Piersky, I have got another one to feed, one more to feed; she hasn't got any money, and, whenever she gets a penny or anything like that, she spends it for whisky, and makes us trouble.''

That Hocking was hard pressed financially during all of the times and was financed in his farming operations and living expenses partly by plaintiff is not disputed by defendants. Plaintiff says that in 1925 Sarah Budgen said: ''Piersky, we are starving and Tom wants to see you''; that he gave her money for groceries and went out to the farm, and

Hocking said, "Piersky, we are starving, we need money." There were some negotiations carried on in March, 1927, looking to the purchase of the lands by plaintiff. On March 27 plaintiff visited defendant Hocking's home. Plaintiff says that on that date in a conversation with Hocking he told him, "Mrs. Piersky offered you $3,000 for the bare ground, or $3,500 with the crop in. He says, 'That only leaves me $500; I couldn't do nothing, can't go anywhere.' We talked different ways. I wanted some security, some protection, and Mary jumped in and that settled the whole business. Q. What did Mary say? A. She insulted me. She called me all kinds of names I don't like to repeat to this court." Sarah Budgen was present at the time, but made no claim of ownership to the premises and said nothing about Hocking having deeded the same to her. In April plaintiff met Sarah Budgen and asked for the payment of $10. She said: "I will pay you when I get damned good and rich; I beat you to the farm, and Thomas shall go to the poorfarm."

Plaintiff's wife testified that after 1925 Mary Dunstan, or Hocking, and Sarah Budgen called at her home "every few months; sometimes every month" for the purpose of borrowing money; that in a conversation had with them on March 5, they said that Piersky "was awful mean and wanted to get the ranch when he is working"; that on March 6 she saw Hocking and offered to purchase the ranch for $3,000; "then he told me that $3,000 was still a little bit; that would leave him only $500 and he couldn't do much with that money," and "then he told me, 'Mrs. Piersky, I don't owe anybody a cent except for groceries' "; that Mary Hocking and Sarah Budgen insisted they would never sell the ranch for less than $4,000 or $4,500.

William A. Lavelle testified that he was acquainted with defendants; that Richard Dunstan, or Hocking, was the son of Thomas and Mary Hocking, and that Hocking had said, referring to Richard: "That is my boy and I am damn proud of him"; that Sarah Budgen had remarked that "Piersky has been awful good to us people; we get lots of money lots

of times; wouldn't know what we would have done if it hadn't been for Piersky."

David R. Smith, one of plaintiff's attorneys, testified that he visited the home of defendants on April 4, 1927, for the purpose of obtaining a mortgage upon the lands owned by Hocking to secure the payment of moneys loaned him by plaintiff; that he interviewed Hocking regarding a mortgage and "at first he thought he would give me the mortgage on it. He said it was true that Piersky had furnished the money to him and he thought that that should be secured to a certain extent; and then, while I was talking with him, Sarah Budgen and Mary Hocking came in and they made several remarks to me, and Mary Hocking started in and made several remarks about Mr. Piersky being crooked and had tried to beat them out of half of the business, something like that; first it was one thing, then it was another thing. * * * And Mary Hocking started in and addressed Thomas Hocking, saying, 'You will not give a mortgage on this place; I will not stand for it, and that Mr. Piersky is a crook,' and a lot of those terms, and he wasn't entitled to that amount of money on a lot of those items that he said he got; that it wasn't right; they had forged, the signatures are forged and things of that kind, and then Sarah Budgen addressed Thomas Hocking and said, 'You will not give a mortgage on this place; Piersky is not entitled to a mortgage until he straightens out these various items and to the amount'; and then Thomas Hocking said, 'I don't think he should have all of that money either'; that he didn't think there was enough left for him to get any satisfaction out of his property. * * * And then Mary would start weaving over the bed there, telling Hocking he shouldn't give the mortgage, and Sarah Budgen was talking to him on the same thing." Neither of the parties made any mention of the fact that the property had been deeded to Sarah Budgen. On April 5 or 6, Sarah Budgen came to the office of witness and showed him a deed to the property and said, "Now I have a deed for the place."

Thomas Hocking was called as a witness for plaintiff and testified that he executed a deed conveying the lands in controversy to Sarah Budgen at his home in the presence of Sam Travis and Emil Jonak; that after its execution it was taken to Helena by Sarah Budgen for recordation. In answer to the question, "What was your purpose in deeding it to Mrs. Budgen?" the witness answered, "My purpose was I was sick and not able to take care of myself; I had to sell it to her; I was owing her money. * * * Q. What amount of money did you owe her? A. I can't tell that now"; that the money borrowed was used "to buy stuff on the land, seed, and such like." That on March 12, 1927, the date of the deed to Sarah Budgen, he owned no other property. On cross-examination by his own attorney he testified to an additional consideration of $1,000 paid in cash at the time of the execution of the deed. On redirect examination he said he put the money in his pocket and "spent it in living"; that from time to time he gave part of the money to Sarah Budgen to buy groceries with for the use of the family. When asked whether or not he spent the money in Helena he answered, "That is my business. * * * That is my business what I done with it."

Sam Travis testified for defendants that at the request of Sarah Budgen he took her, together with Emil Jonak, to the ranch of Hocking, for the purpose of witnessing the execution of the deed; that it was signed by Hocking, and that Mary Budgen paid cash to Hocking; that after Hocking received the money "he held it out and said: 'Do you want to count this?' I said, 'No, I don't know as I want to count it.' Jonak spoke up and said, 'No, I don't want to count it. I just want to witness the signature'; that's all"; that there was something said about a deal on the ranch, and when the deed was signed it was delivered to Sarah Budgen.

Sarah Budgen testified that she had lived at the Hocking ranch since her return from the State Hospital, except when she was working and a three months' visit with her daughter; that she had been to plaintiff's home, but that she did not

know of Hocking's transactions with plaintiff. "Mr. Hocking didn't allow me to do anything; didn't allow me to have anything to do with his business. * * * I had nothing to do with his business." She further testified that, in addition to the $1,000 paid by her to Hocking, she promised to take care of Hocking "while he lived," but made no reference whatever to any indebtedness for moneys loaned by her to Hocking as testified to by him; that since the transfer of the property to her she had cared for Hocking, who is an invalid; "he has to be attended to like a new born baby."

It will be noted that the various conversations testified to by witnesses for plaintiff relative to Sarah Budgen's conduct and her statements and attitude regarding the execution of a mortgage to secure plaintiff, as well as her statements to plaintiff that she "beat" him to the ranch, and her statement to Smith on April 5, are not denied or explained. No explanation is given as to when or under what circumstances she came into possession of the $1,000 in bills which she claims to have paid to Hocking.

The record also discloses that on April 5, 1927, and after Hocking claims he conveyed the lands to Sarah Budgen, the defendants entered into an agreement with Adelaide D. and H. W. Child, wherein they agreed for a consideration of $375 to convey a right of way for ditches across the lands in controversy.

It is insisted by counsel for defendants that we may go no further than to determine whether there is a preponderance in the evidence against the findings of the trial court, and, since the findings are based upon conflicting evidence, the judgment will not be disturbed. While it is true that in equity cases this court will go no further than to determine whether there is a preponderance in the evidence against the findings of the lower court, it is equally true that the trial court may not disregard uncontradicted credible evidence. (*Laundreville* v. *Mero,* 86 Mont. 43, 69 A. L. R. 416, 281 Pac. 749; *Sylvain* v. *Page,* 84 Mont. 424, 63 A. L. R. 528, 276 Pac. 16.)

The uncontradicted testimony shows that defendants, during the period involved, lived partly upon the bounty of plaintiff; that during the month of March, 1927, plaintiff was attempting to obtain a mortgage to secure him for the money loaned; that a controversy arose as to the amount due and whether Hocking should secure the loan by a mortgage; that defendants Sarah Budgen and Mary Dunstan objected to Hocking signing a mortgage and directed him not to do so; that Sarah Budgen knew of Hocking's indebtedness to plaintiff and his efforts to obtain a mortgage to secure its payment; that in April, 1927, she said to Piersky, "I beat you to the farm," and to David R. Smith on April 5, "Now I have a deed to the place"; that she had not at any time in prior negotiations claimed ownership of the premises; that Hocking on April 5 executed an agreement for a right of way across the lands, and that Sarah Budgen had been for many years a close personal friend of Hocking and a member of his household. These undisputed facts, when considered in connection with the alleged payment of the purchase price and the discrepancy in the testimony of Hocking and Sarah Budgen regarding the alleged consideration for the lands and the financial condition of the defendants, lead rationally to but the one conclusion—that Hocking transferred his holdings to Sarah Budgen for the purpose of cheating and defrauding his creditors. No other fair or reasonable conclusion is possible. Considering the facts relating to Sarah Budgen's financial circumstances, the testimony concerning the payment of $1,000 in cash, under the conditions described, is incredible, and so at variance with the undisputed facts that the findings based thereon cannot stand.

Without further discussion of the evidence, we are of the opinion that upon rules of equity and after a most careful consideration and analysis of all the evidence, taken in connection with all the surrounding circumstances, the credible evidence clearly preponderates against the findings of the trial court.

We are mindful of the advantageous position occupied by the trial court in having the witnesses before it, in hearing them testify and observing their demeanor, and, while the appearance of a witness is an aid in judging his credibility, it is not an infallible one. "Dissimulation is often difficult to detect, and falsehood is often clothed in the garb of truth. Whenever the surrounding circumstances make the story of a witness highly improbable or incredible, or whenever the testimony is inherently impossible," the findings based thereon must be set aside. (*Casey* v. *Northern Pac. Ry. Co.*, 60 Mont. 56, 198 Pac. 141, 145; *Whitney* v. *Bertoglio Merc. Co.*, 65 Mont. 358, 211 Pac. 323; *State* v. *Gunn*, 85 Mont. 553, 281 Pac. 757.) Conditions and circumstances may point so unerringly to the truth as to leave no room for a contrary conclusion based on reason and common sense, and under such situation the conditions and circumstances are not affected by sworn testimony which in mere words conflicts with them. So here, the circumstances and undisputed facts point unerringly to the conclusion that Hocking conveyed the lands in question to Sarah Budgen for the purpose of hindering, delaying and defrauding his creditors and are not affected by the sworn testimony as to the consideration alleged to have been paid by her.

The language of Mr. Justice Holloway, speaking for the court in *Giebler* v. *Giebler*, 69 Mont. 347, 222 Pac. 436, 438, is pertinent here: "Finally it is argued that the trial court determined in favor of the defendant the issue raised upon the question of desertion, and that this court ought not to disturb the finding. This being a suit in equity, the rule obtains that the decision of the trial court will not be disturbed unless the evidence preponderates against it. (*Kummrow* v. *Bank*, 66 Mont. 434, 214 Pac. 1098.) But what is to be said of a case of this character where the uncontradicted evidence establishes the plaintiff's cause of action, and where the record is barren of any suggestion that plaintiff or any of his witnesses is unworthy of belief, but, notwithstanding these facts, the trial court finds against the plaintiff? Where, as in this instance, a cause is tried to the court, its decision or finding has the

same effect as the verdict of a jury, and, when contrary to or not sustained by the evidence, will be set aside. (20 R. C. L., p. 280, sec. 62.) The rule that the trial court may not disregard uncontroverted credible evidence is fundamental. (*Haddox* v. *Northern Pac. Ry. Co.*, 43 Mont. 8, 113 Pac. 1119.) This court has not hesitated to set aside findings contrary to the preponderance of the evidence, and this we deem to be the duty imposed by our Bill of Rights (Sec. 6, Art. III, Const.) * * *` 'This court has power, and it is its duty, so far as it may, exercising a due regard for the findings of the district court, based, as they are, upon the testimony of witnesses delivered *ore tenus* in the presence of the court, to reach its own conclusions, and to declare upon the rights involved accordingly. Owing to the advantageous position of the trial court, due to the conditions just adverted to, this court will naturally hesitate to overturn findings based upon substantially conflicting evidence which would justify an inference in favor of either side of the controversy; but * * * where the evidence preponderates decidedly against the finding, this court may, looking to the nature of the evidence, proceed to examine it, and make up its own conclusion.' (*Bordeaux* v. *Bordeaux,* 32 Mont. 159, 80 Pac. 6.) ''

But it is argued by counsel for defendants that plaintiff's ▆ complaint and the proof fail to show that plaintiff acquired a lien in the property by reason of the writ of attachment, which is a condition precedent to the maintenance of the action. A similar question was before this court in *Ferrell* v. *Elling,* 84 Mont. 384, 276 Pac. 432, and decided adversely to defendants' contention.

It is contended by defendants that, since it appears that ▆ Sarah Budgen has partly performed her agreement to care for Hocking, and had in fact cared for him approximately two years prior to the trial of the cause, the conveyance will be sustained to the extent of the support and care furnished.

By the great weight of authority, if the parties to a conveyance, made in consideration of the future support of the grantor, *act in good faith,* and support is in fact furnished,

374

the conveyance will be sustained, as to creditors, to the extent of the support furnished. (*J. G. Cherry Co.* v. *Helm,* 98 Neb. 626, 2 A. L. R. 1436, and note, 154 N. W. 205; *Smith* v. *Clark,* 242 Mass. 1, 23 A. L. R. 582, and note, 136 N. E. 66; *Consolidated Rendering Co.* v. *Martin,* 128 Me. 96, 64 A. L. R. 790, 145 Atl. 896.) This rule has no application here, since the evidence clearly establishes that Sarah Budgen was a party to the fraud. She will not now be permitted to benefit through her own fraud and claim an interest in the lands fraudulently conveyed to her.

It is contended by defendants that the testimony of David R. Smith cannot be considered, since it appears that on April 4, when Smith visited at the home of Hocking, he was acting as attorney for the defendants. The record discloses that on and prior to the date mentioned, Smith was representing defendants in connection with a controversy with H. W. Child relating to a right of way across Hocking's land, a matter in no way connected with the Piersky claim. Defendants were advised by Smith of the purpose of his visit and that he represented Piersky. We think the testimony does not come within the inhibition of section 10536, Rev. Codes 1921, as amended by Chapter 83, section 1, Laws of 1925.

It is a general rule that an attorney cannot testify without his client's consent to matters communicated to him in confidence and in the course of his professional employment; but, for a communication from a client to his attorney to be privileged, it must be of a confidential nature, at least so regarded by the client, and must relate to a matter which in its nature is private and properly the subject of confidential disclosure. (40 Cyc. 2370.) It must relate to the subject matter of the employment, and given to the attorney for the purpose of enabling him properly to understand the matter in which he is employed. (40 Cyc. 2371.) Manifestly, the matters testified to by Smith were not of a confidential nature and not related to the subject matter of his employment.

This is an equity case and all of the evidence is before us; it sustains the allegations of plaintiff's complaint; therefore, no useful purpose could be subserved by remanding the cause for a new trial.

The judgment is reversed and the cause remanded to the district court, with directions to enter judgment for plaintiff in accordance with the prayer of his complaint.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES ANGSTMAN concur.

JUSTICES MATTHEWS and GALEN, being absent, did not hear the argument and take no part in the foregoing decision.