LANGSTON ET AL., APPELLANTS, *v.* CURRIE ET AL., RESPONDENTS.

(No. 7,072.)

(Submitted May 29, 1933. Decided July 15, 1933.)

[26 Pac. (2d) 160.]

58

*Mr. Miles J. Cavanaugh, Mr. R. Lewis Brown* and *Mr. S. C. Ford,* for Appellant A. G. Langston, submitted an original and a reply brief; *Mr. Brown* and *Mr. Ford* argued the cause orally.

*Messrs. William* and *Henry Meyer,* for Appellant Edna B. Gillies, submitted a brief; the former argued the cause orally.

*Mr. J. A. Poore* and *Mr. N. A. Rotering,* for Respondents, submitted a brief; *Mr. Poore* argued the cause orally.

62

MR. JUSTICE ANDERSON delivered the opinion of the court.

John G. Currie, an elderly bachelor, died intestate in Silver Bow county leaving surviving him as heirs a sister and the children of deceased brothers and sisters. The sister died before the commencement of this action.

Plaintiff Langston brought this action against John P. Currie, the administrator of John G. Currie's estate, as administrator of the deceased sister's estate, the heirs of John G. Currie, deceased, and Edna Gillies. Prior to the commencement of this action, Edna Gillies commenced an action against the other defendants in this case. She filed a cross-complaint to the complaint of plaintiff Langston containing substantially the same allegations as in her complaint. The two cases were tried together.

The plaintiff brought this action, asserting that under a contract made with John G. Currie in his lifetime, which had been by plaintiff performed, he was entitled to the entire estate, and prayed in his complaint that he be adjudged the owner thereof.

Edna Gillies, by her complaint and cross-complaint, alleged that under a contract entered into between her parents and John G. Currie during her minority, and which contract was renewed and confirmed with the deceased upon attaining her majority and which had been by her fully performed, she was entitled to one-third of the estate of John G. Currie, deceased, and prayed for specific performance of the contract.

The various answers denied all the allegations of the complaints and cross-complaints other than the deaths of Currie and his sister, appointment of administrators, and other formal allegations. No questions are here raised as to the sufficiency of any of the pleadings, and it is therefore unnecessary to note their allegations in detail.

The cases were tried before the court sitting without a jury. The trial judge made findings wherein it was determined that John G. Currie died April 5, 1930, intestate, leaving an estate of real and personal property in excess of $50,000 in value, the identity of his heirs at law, the appointment of the administrators, that the deceased did not enter into the contract alleged and set forth in plaintiff Langston's complaint, and that he did not enter into the contract alleged and set forth in the cross-complaint of Edna Gillies. Judgment was entered in accordance with the findings and conclusions of law based thereon, dismissing plaintiff's complaint and the cross-complaint. Plaintiff Langston and cross-complainant Edna Gillies have appealed from the judgment.

Plaintiff Langston produced witnesses who testified as to declarations made by John G. Currie in his lifetime during a number of years on various occasions. Benjamin Osborn testified that Currie said of Langston, "He was awfully good to me. He takes good care of me. He been with him for a number of years, and looked after me. And he said, 'When I die, he is going to get all I got.'" The witness Smith testified that the deceased said, "If he had anything when he had left, it all belonged to Mr. Langston." The witness Graf, testifying with reference to statements made by Currie, speaking of the plaintiff Langston said that Currie stated, "I am going to fix up my partner. I make the will up." One Charles Snyder testified that Currie said in his presence, speaking of Langston, "Everything I have is Glen's."

Miles Cavanaugh, a highly respected member of the bar, who had acted as attorney for the deceased on numerous occasions for some years prior to the latter's death, testified with reference to a conversation wherein he inquired of Currie, "John,

did I ever make a will for you?'' receiving the following response: ''Everything is all fixed.'' The witness further testified that this conversation occurred at a time when he prepared a deed conveying certain real estate to one of the now heirs, and he said that Currie then declared that his relatives would never get anything of his property other than the land.

Numerous witnesses testified as to Langston living with the deceased and caring for him, particularly from the year 1928 until his death.

Currie for many years resided in a two-story house containing two rooms on each floor. The sleeping quarters were in the upper story. One of the rooms on the lower floor was a kitchen, dining-room and living-room. The other room was occupied by the deceased's chickens, and they frequently in the daytime shared the living-room with the deceased. The furnishings were meager, and all the witnesses agree that the living quarters of the deceased were anything but clean. The dwelling had no modern conveniences whatever.

Plaintiff Langston testified that in the year 1914, having theretofore become acquainted with the deceased, he resided with him for a period of approximately a month while he was concluding certain business affairs. The deceased at that time was the owner of two unpatented mining claims. He had a horse, and sometimes two, on his premises in Butte. The care of the horse or horses, his chickens, and the doing of the assessment work on the mining claims until they were patented, was the extent of the deceased's activities at the time when Langston first lived with the deceased, and during the residue of Currie's life. He testified that after this sojourn with the deceased he discussed the securing of employment, but that Currie requested him to remain, and assured Langston that he did not need work because he would pay Langston $150 per month if he would continue with Currie as long as he lived, payable $50 each month, and the residue of $100 per month payable upon Currie's death. Langston stated that he accepted the employment, the consideration for this agreement

being that he (Langston) was to help take care of the place, assist in the doing of the assessment work on the mining claims, in the care of the animals, and "mostly" be a companion to the old man. This oral agreement was entered into about May 15, 1914.

Langston testified that in the month of June, 1914, he gained the consent of Currie to go to North Yakima, Washington, where he secured employment at his trade as a boiler-maker until the following October. Then he returned, residing with Currie until in July, 1915, when he obtained consent to follow his trade at Miles City, where he was employed for some two or three weeks; then he proceeded to Sioux City, Iowa, where he was employed until 1923. He returned to Butte for approximately three months each year, with the exception of the year 1918, spending these vacations with the old gentleman, doing the assessment work on the claims, repairing the premises, and caring for the livestock. In 1923 he returned to Butte at the request of Currie, who was ill, and, after the lapse of several months, Currie having regained his health, Langston suggested that he secure employment at his trade, which he did at a point some sixty miles distant. He returned week-ends and spent them with Currie until the year 1928, at which time he secured employment in Butte at his trade and lived with Currie until his death.

Admittedly, no part of the $150 stipend per month was ever paid by Currie to Langston. Langston testified that in 1924 he received a communication from his former employer at Sioux City, Iowa, offering him a better position than he then held, but that Currie was unwilling to have Langston return there, and it was thereupon orally agreed that the former agreement was rescinded, and that, if Langston would perform the agreed services, he would receive at Currie's death all his property. According to Langston, all of his absences from the time of their first contract were with the consent of Currie.

The parents of cross-complainant Edna Gillies resided across the street from the Currie residence from the time of her early childhood, she being now a woman of some forty-seven years

of age. Her mother testified that at the time Edna was twelve years old Currie had become attached to Edna, her only daughter, and expressed his desire to her parents to adopt Edna as his child, to which they were unwilling to consent, and thereupon Currie suggested that, if they would let "her come over and be a companion for me and run errands and talk to me" and continue to be a companion until Currie died, he would leave Edna one-third of his estate. Much testimony was received as to the attention and little services rendered for Currie by Edna during her childhood. Various witnesses testified to statements made by Currie indicative of his intention to bestow some portion of his estate upon Edna. It was testified by a number of witnesses that on Christmas, 1929, he gave her a Christmas present of $25 in money, at which time he said, "Sweetheart, hang this on your Christmas tree. Later on you will have a thousand times as much." Another witness testified that on one occasion Currie remarked, "I will see to it that Edna is well paid for the amount of work she did for me." Again it was testified that he said "he had made provision for Edna and she would have no cause for any financial worries." Edna testified that when she became eighteen years of age, she was tired of serving Currie, and expressed her displeasure both to her parents and to him, and as a result it was orally agreed between her and Currie that, if she continued to act as a companion and run errands for him, he would give her at the time of his death one-third of his estate. Thereafter she married, and for some four years resided with her husband at San Francisco, California, although she claims she returned at least once every two months in order to perform her duties as companion to Currie. Later, following her securing a divorce from her first husband, she married a second time, and asserts that she continued to perform the same services. She was absent from Butte as an employee of the state legislature during numerous sessions, but she returned to him during week-ends, and acted as companion for the old gentleman. She testified

that Currie agreed to her being absent on all of the foregoing occasions.

Many of Currie's neighbors were called as witnesses either for Langston or Gillies. Those who testified for Langston observed him performing many acts of service prior to 1928, whereas those who testified for Gillies failed to observe even his presence on the Currie premises during the same period of time. Likewise those who testified for Gillies observed her spending much time with the old gentleman and saw her transporting dainties and delicacies from her own home over to him; while those testifying for Langston only saw her carry grass to feed the old man's horses, and otherwise they did not see her performing any service or acting as companion at any time.

Witnesses testified that Currie expressed his unwillingness to permit his relatives to share any portion of his estate, and that he felt they had not given him a proper amount of attention. Other witnesses testified that he expressed an intention of leaving his entire estate to relatives; that certain of them visited him on a few occasions; that he attended the funeral of a half-brother, and bore a portion at least, if not all, of the funeral expenses willingly.

The respondents have moved to strike the bill of exceptions from the record in this court. It is asserted that the trial court was without jurisdiction to settle the bill of exceptions. Numerous extensions of time were granted by the trial court for the preparation and service of the bill of exceptions. The appellant Gillies did not serve her proposed bill of exceptions until 132 days after the service of the notice of entry of judgment, and the appellant Langston did not serve his proposed bill of exceptions until the lapse of 138 days after the notice of entry of judgment, although both bills were served and filed within the time included in the various orders of the trial court.

The defendants argue in support of their motions that under the provisions of section 9823, Revised Codes of 1921, the time within which a bill of exceptions may be served is

limited to ninety days after notice of entry of judgment, unless consent of the adverse party is secured, and admittedly no such consent was here given. Under the provisions of section 9390, Id., a party desiring to prepare a bill of exceptions has fifteen days within which to prepare the same. The trial court is authorized under the same section to extend the time for sixty days additional and to further extend the time provided a showing is made by affidavit. This section contains no limitation upon the time which may be allowed if good cause is shown. The various applications for extension of time were supported by the affidavit of the court reporter, from which it appeared that he could not prepare a transcript of the testimony owing to the necessity of performing other official duties and the length of the record herein, which, incidentally, is some 1695 pages as filed in this court. In addition, counsel for the various appellants by affidavit disclosed that they had promptly ordered transcripts of the evidence and did everything in their power to expedite the preparation of the bill.

Our attention is invited to the case of *Canning* v. *Fried*, 48 Mont. 560, 139 Pac. 448, holding that the time within which a bill of exceptions may be served is limited to ninety days, unless consent of the adverse party is secured under the provisions of what is now section 9823 of our Code. At the time that case was decided, section 9390, then being section 6788, Revised Codes of 1907, with reference to the settlement of a bill of exceptions, contained no provision for any extension of time. The only statutory authority for the extension of time then existing was what is now section 9823, which is a general statute. In 1921 our legislature enacted what is now section 9390, including, among others, the provisions herein noted. That section pertains especially to bills of exceptions, their preparation and settlement. Section 9823 has not been amended since the enactment of section 9390, as it now exists. Where there is one statute dealing with a subject in general and comprehensive terms, and another dealing with a part of the same subject in a more minute and

definite way, the two should be read together and harmonized, if possible, with a view to giving effect to a consistent legislative policy; but, to the extent of any necessary repugnance between them, the special will prevail over the general. (*State ex rel. Daly* v. *Dryburgh,* 62 Mont. 36, 203 Pac. 508.) To adopt the construction contended for would lead to confusion and uncertainty. This court observed in the case of *In re Baxter's Estate*, 94 Mont. 257, 22 Pac. (2d) 182, 185, construing section 9390, supra: "We prefer to give the statute a liberal interpretation which will tend to simplify rather than add confusion to the practice."

We therefore hold, under the provisions of section 9390, the trial court had authority, on proper showing made by affidavit, to grant an extension in excess of ninety days within which to prepare and serve a bill of exceptions. The motion to strike the bill of exceptions is accordingly denied.

The testimony of Langston and Edna Gillies with reference to their respective oral contracts was received by the trial court over objection made upon the ground that the same was inadmissible under the provisions of subdivision 3 of section 10535, Revised Codes of 1921, which provides as follows: "The following persons cannot be witnesses: * * * 3. Parties or assignors of parties to an action or proceeding, or persons in whose behalf an action or proceding is prosecuted against an executor or administrator upon a claim or demand against the estate of a deceased person, as to the facts of direct transactions or oral communications between the proposed witness and the deceased, excepting when the executor or administrator first introduces evidences [evidence?] thereof, or when it appears to the court that, without the testimony of the witness, injustice will be done."

Counsel for the respective appellants argue that the testimony was admitted. It is apparent from the record that the trial judge received the testimony subject to the objection on behalf of each of the respondents, reserving the question of its admissibility for later consideration. We are unable to determine from the record whether the court found that neither

of the appellants entered into a contract with the deceased by reason of the exclusion of this testimony, or, in making its findings, treated their testimony as in evidence, and from the entire record found against the appellants.

This court on a number of occasions has had under consideration the provisions of section 10535, supra. In the case of *Wunderlich* v. *Holt*, 86 Mont. 260, 283 Pac. 423, 427, in the special concurring opinion of the Chief Justice, which was concurred in by the majority of the court, speaking with reference to this section, it was said: "A trial court should not admit the testimony of a witness, prima facie incompetent, until sufficient other testimony is admitted to warrant the court in exercising its discretion in favor of the questionable testimony. (*Cobb* v. *Follansbee*, 79 N. H. 205, 107 Atl. 630.) The court must exercise its discretion with caution and reasonable strictness, and not so loosely as to infringe on the general rule, unless it reasonably appears that otherwise injustice will result, and therefore the exception rather than the rule should apply." (See, also, *Marcellus* v. *Wright*, 65 Mont. 580, 212 Pac. 299.)

At the time the objections were made, the only testimony then before the court which could in any way tend to lay the necessary foundation was that as to the acts of performance by the appellants and the declarations of the deceased. It will be noted that none of the declarations were to the effect that a contract had been entered into, but they were to the effect that the deceased intended either to make a will in favor of appellants or in some manner convey his property or ▉ some portion thereof to the appellants. Declarations against interest are said to be the weakest and least satisfactory of any evidence in persuasive value. (*Sanger* v. *Huguenel*, 65 Mont. 236, 211 Pac. 349; *Escallier* v. *Great Northern Ry. Co.*, 46 Mont. 238, 127 Pac. 458, Ann. Cas. 1914B, 468.)

Statutes similar to our own which leave the admission of direct oral communications to the discretion of the trial court in order to prevent an injustice, where the action is brought

by a party to the transaction against an executor or administrator of a deceased person, are few, indeed, among our family of states. The state of Arizona has for many years had a statute somewhat differently worded, but, as construed by the supreme court of that state, held to lead to the identical result as our own as construed by this court. (*Goldman* v. *Sotelo,* 7 Ariz. 23, 60 Pac. 696.) The Arizona court, after observing that declarations against interest are a weak and unsatisfactory type of evidence, held declarations made to third parties insufficient as a foundation for the admission of testimony offered by a party where he sues an administrator as to oral transactions between him and the decedent, and that the trial court did not abuse its discretion in rejecting such offered testimony. (*Johnson* v. *Moilanen,* 23 Ariz. 86, 201 Pac. 634.)

The evidence as to the performance at the time the testimony of each of the appellants was offered, was that performance was occasional and not continuous, as alleged in the complaints of the respective appellants. It is for the trial court to determine the competency of the class of evidence under consideration, in the exercise of its sound discretion. It cannot be said as a matter of law that the evidence of performance and the declarations against interest was of such a nature and character as would lead to the conclusion that the appellants, or either of them, had in all probability a prima facie meritorious cause of action, and, in the absence of such a foundation, this court is unable to say that the trial court abused its discretion, if it rejected the testimony.

It is urged by the cross-complainant, Gillies, that the administrators were unnecessary parties, and that therefore the provisions of section 10535, supra, are without application. It is beside the point whether the administrators of the decedents were necessary parties; they were proper parties. (Sec. 10258, Rev. Codes 1921.) And, if they were proper parties, and having been made such, then the disqualification exists until removed by a ruling of the trial court in the exercise of its sound legal discretion.

The trial court, as noted above, did not rule on the objections to the admission of this testimony, a practice which this court has recently had occasion to condemn in the case of *Gilcrest* v. *Bowen,* ante, p. 44, 24 Pac. (2d) 141, and what was there said need not be repeated here. If trial courts find it desirable or expedient to reserve the ruling on objections and motions during the progress of judicial proceedings, they should at some time at or before final judgment resolve such questions and make an appropriate record of their conclusions. We are aware that the practice referred to is usual among trial judges. Eventually a cause will reach this court wherein it will be necessary to reverse the same because of the failure of the trial court to dispose of objections or motions which have arisen during the progress of the trial.

As we have stated above, however, counsel for the parties on this appeal have treated the objection under discussion as overruled. They have assigned no error on the failure of the court to rule. Appellants have argued the case both in their briefs and orally as though this evidence was admitted. We have engaged in this discussion only in order truly to reflect the condition of the record as presented. Therefore it becomes necessary for us to determine whether the evidence preponderates against the findings of the trial court. We enter upon a review of the evidence indulging the presumption that the judgment is correct. (*State ex rel. Woare* v. *Board of Commrs. of Liberty County,* 70 Mont. 252, 225 Pac. 389; *Baker* v. *Citizens' State Bank,* 81 Mont. 543, 264 Pac. 675.) And every legitimate inference will be drawn from the evidence to support this presumption. (*Security State Bank* v. *Soule,* 70 Mont. 300, 225 Pac. 127; *Baker* v. *Citizens' State Bank,* supra.)

Proof of a parol agreement that the decedent promised to leave or convey all or a substantial portion of his property to the appellants must furnish all the essentials of a contract which must be fair and equitable, and the terms thereof definite and certain, and the agreement must be clearly established by the testimony. (*Sanger* v. *Huguenel,*

65 Mont. 236, 211 Pac. 349, 350.) However, a preponderance of the evidence is sufficient to sustain the allegations of the complaint. (*In re Wray's Estate,* 93 Mont. 525, 19 Pac. (2d) 1051.) When we say the agreement must be clearly established, we refer to the quality of the testimony, and not to the quantity. (*Sanger* v. *Huguenel,* supra.)

The declarations testified to on behalf of each of the appellants as having been made by the deceased did not in any instance contain an admission by the decedent of the existence of any contractual obligation owing by him to either of them, as alleged in their respective pleadings. Declarations of this character, standing alone or coupled with acts of performance under the alleged contract, do not establish the contract alleged. (*Clark* v. *Clark,* 74 Utah, 290, 279 Pac. 502, 503; *Allen* v. *Sackett,* 76 Colo. 431, 231 Pac. 1110; *Timmerman* v. *Whiting,* 118 Minn. 398, 37 N. W. 9; *Moore* v. *Moore,* 58 Neb. 268, 78 N. W. 495.) As stated above, admissions against interest of a deceased person are said to be the weakest and least satisfactory of any evidence in persuasive value. (*Escallier* v. *Great Northern Ry. Co.,* supra; *Sanger* v. *Huguenel,* supra.)

Each of the appellants testified in detail as to the services rendered by them in the performance of their respective alleged contracts. Each of them was contradicted in this respect by the testimony of numerous witnesses. This court in the case of *Sanger* v. *Huguenel,* supra, said: "The witnesses herein appeared before the trial judge and testified. He heard what each of them said, and saw how or the manner in which they said it. He observed their general appearance while testifying, their candor or lack of candor, their fairness or lack of fairness, and in arriving at its conclusions, the trial court also had before it the printed record of what was said by each of these witnesses. This court has before it only the printed record. Obviously the trial court is in a much better position to pass judgment upon the evidence than is this court; therefore, the rule, frequently announced by this court, that the findings of the trial court will not be disturbed, unless

the evidence clearly preponderates against such findings. (*Bosanatz* v. *Ostronich*, 57 Mont. 197, 187 Pac. 1009; *Boyd* v. *Huffine*, 44 Mont. 306, 120 Pac. 228; *Winslow* v. *Dundom*, 46 Mont. 71, 125 Pac. 136; *Noyes Estate* v. *Granite-Alaska Co.*, 64 Mont. 406, 210 Pac. 96.)'' (See, also, *Labbitt* v. *Bunston*, 84 Mont. 597, 277 Pac. 620.)

If the trial court believed the witnesses who testified disputing the performance by the appellants, then it found the testimony of the appellants with reference thereto was false; and a witness who is false in one part is to be distrusted in others. (Subd. 3, sec. 10672, Rev. Codes 1921.) The only testimony from which it would have been possible for the trial court to have found the existence of the contracts, or either of them, was the testimony of the respective appellants as to their verbal contracts with the deceased. Therefore, if the trial court determined on the conflicting testimony that the appellants' testimony was not worthy of credit and was to be distrusted, there was no credible evidence in the record to warrant a finding in favor of the appellants, or either of them. In view of this state of the record, we cannot say that the evidence preponderates against the court's finding.

Both Langston and Gillies testified as to numerous modifications of their respective alleged contracts in order to excuse themselves satisfactorily from their obligations to perform these contracts. Currie, although a man of considerable means, was apparently content to live in a condition of squalor. It appears to us that it is extremely doubtful that one who manifested such a desire to retain his money even to the end of a long life, as did Currie, would so freely release these appellants from the obligations of their respective contracts. A careful reading of the entire contract in this case leaves us with a feeling of doubt and suspicion as to the verity of appellants' testimony. This court in the case of *Casey* v. *Northern Pacific Ry. Co.*, 60 Mont. 56, 198 Pac. 141, 145, said: ''It is a wild conceit that any court of justice is bound by mere swearing. It is swearing credibly that is to conclude its judgment.''

We are mindful of the rule often announced by this court ▮▮▮▮ that a trial court may not disregard uncontradicted credible evidence (*Piersky* v. *Hocking*, 88 Mont. 358, 292 Pac. 725), but, as we have demonstrated, the court was justified in not giving credit to the testimony of the appellants with reference to the verbal contracts. The trial court observed the witnesses testify, and was in a better position than is this court to determine to whose testimony credit should be given; and, that court having resolved that question, this court is without authority to disturb the conclusion reached by it.

The judgment is affirmed.

Mr. Chief Justice Callaway and Associate Justices Matthews and Stewart concur.

Mr. Justice Angstman, Dissenting: In my opinion, the evidence, aside from the facts of direct transactions and oral communications between Langston and Edna Gillies and the deceased, was sufficient to lay the foundation for the reception of evidence by them as to the oral communications between them and the deceased. The statute permits such testimony "when it appears to the court that, without the testimony of the witness, injustice will be done." (Subd. 3, sec. 10535, Rev. Codes 1921.) The reason for this statute was pointed out in *Roy* v. *King's Estate*, 55 Mont. 567, 179 Pac. 821, and it was there held that, if plaintiff was able to make out a prima facie case without the testimony of facts of direct transactions or oral communications between plaintiff and the deceased, it would not be an abuse of discretion to exclude such testimony. Conversely, if plaintiff could not make out a prima facie case without such testimony, it should be admitted. This was the holding in the case of *Wunderlich* v. *Holt*, 86 Mont. 260, 283 Pac. 423. Here, if the oral communications were admitted and believed, they unquestionably established a contract. Without the oral communications, plaintiffs did not make out a prima facie case.

In my opinion, if the court excluded this evidence as being inadmissible, it abused its discretion and committed reversible

error. As pointed out in the majority opinion, we are unable to determine from the record whether the court treated this evidence as admissible or inadmissible. It is inconsistent to hold, first, that the trial court did not abuse its discretion in excluding this evidence, and then to say that it was justified in determining, in its discretion and from the point of vantage occupied by it, that it was unworthy of belief. The latter question did not receive the consideration of the court if the evidence was regarded as inadmissible.

This case presents a striking example of the difficulty that confronts this court and the litigants and their counsel on appeal when the lower court fails to rule upon the admissibility of evidence presented to it, either when offered or upon final determination of the cause. Had the trial judge determined in his discretion that the evidence of facts of direct transactions or oral communications between the plaintiff and cross-complainant on the one hand, and the deceased on the other, was admissible, as I think he should have, and had he on all the evidence found in their favor, as he might well have done had he thought the evidence admissible, we would certainly be unable to say that his decision was not supported by a preponderance of the evidence. As the record stands, it is impossible to indulge presumptions in favor of the judgment attendant upon the ordinary case, where the offered evidence is either admissible or inadmissible, as a matter of law, and not dependent upon discretion.

The suggestion in the majority opinion that appellants have not assigned error on the failure of the court to rule on the admissibility of this evidence, and that they briefed the case as though the evidence was admitted, hardly furnishes an excuse for overlooking the failure of the court to rule. Appellant Langston assigned error that the judgment is against the decided preponderance of the evidence. Appellant Gillies assigned as error that the evidence is insufficient to justify the decision of the court. In order intelligently to determine these assignments, it is necessary for this court to know what evidence was before the trial court and whether certain evi-

dence in the record was excluded as inadmissible or was admitted and found unworthy of belief. Neither, in my opinion, should this court be bound in any case by the manner in which it is briefed in this court.

On the state of the record I am unable to join in an affirmance of the judgment.

Rehearing denied November 2, 1933.