LUDWIG, APPELLANT, v. MONTANA BANK AND TRUST CO., RESPONDENT.

(No. 7,924.)

(Submitted October 4, 1939. Decided December 30, 1939.)

[98 Pac. (2d) 379.]

*Mr. H. Norskog,* for Appellant, submitted an original and a supplemental brief, and argued the cause orally.

*Mr. G. G. Harris,* for Respondent, submitted an original and a reply brief, and argued the cause orally.

MR. JUSTICE MORRIS delivered the opinion of the court.

The complaint in this action alleges the corporate existence of the defendant as a banking concern at the city of Great Falls; plaintiff's ownership of two checks in which she was named as payee aggregating $26,700, drawn on the First National Bank of Great Falls; the deposit of the checks in the defendant bank; the conversion thereof by the defendant to plaintiff's damage in the sum above mentioned; admits that, prior to the commencement of this action, restitution was made of the sum of $15,555.52 at one time and of the further sum of $1,640 at another time; also prior to the commencement of this action and subsequent to the sums mentioned being restored, plaintiff made demand upon the defendant for the sum alleged converted in the amount of $9,504.48, which demand was refused; further alleges that the checks were deposited in defendant bank without plaintiff's knowledge or consent, and that the checks were made payable to plaintiff and were not endorsed by her.

The defendant, after notice thereof, moved the court to substitute Lillian Ludwig Hutchison, the daughter of the plaintiff, in place of the defendant bank or in the alternative to bring the daughter in as a party to the action, alleging that the cause could not otherwise be tried on the merits. Defendant's motion was supported by the affidavit of the cashier of the bank alleging facts in defense and reasons for such substitution which will later appear. The court, on its own motion, gave the defendant ten days further to plead to the complaint and combined in its order for such additional time the condition

that if the court should finally determine another defendant should be substituted for the defendant bank the action would be dismissed as to the bank. Counsel for plaintiff filed an affidavit setting forth that Lillian Ludwig Hutchison was a resident of the state of California, was not, at the time, within the state of Montana, nor had any property in this state. The motion for substitution was thereupon denied.

The answer is in the nature of a general denial; admits, however, the receipt for deposit of the two checks and the collection of the amounts named therein from the drawee bank, the First National Bank of Great Falls, and, by way of affirmative defense, alleges that the amount of the checks was credited to the joint account of the plaintiff and her daughter, Lillian, and checked out by one or the other of the two, according to the provisions of their joint account agreement; admits the demand of plaintiff and its refusal; that the checks were deposited by the daughter, one of the two parties authorized to draw against the joint account, admits the checks were not endorsed by plaintiff, but alleges a custom exists amongst banks in Great Falls to the effect that when a check is presented by one other than the payee for deposit to the credit of the payee, and it is not endorsed by the payee, a rubber stamp is used by the bank and the words, "Credit account of payee—endorsement guaranteed," are stamped on the back of the check, and that such a stamp was used on the checks involved here, and the full amount credited to the joint account of the plaintiff and her daughter; that plaintiff herself drew checks against the joint account, and in addition that plaintiff accepted from the daughter in restitution a large portion of the $25,000 withdrawn from the joint account by the daughter and which plaintiff now complains was converted by the defendant to its own use; that the plaintiff by her acts ratified the acts of the daughter in making the deposit in the joint account in that the plaintiff approved on a number of occasions withdrawals of funds from the joint account on checks signed by the daughter only, and further by holding the daughter out as one upon whom she depended to look after and handle her business affairs; that the plaintiff and her daughter

did, on May 28, 1937, call at the banking office of the defendant, contacted Mr. Fousek, the cashier, advised him that the plaintiff was arranging to have her deceased husband's estate settled; that she intended to dispose of her interest in the estate in Great Falls, turn the management of her affairs over to the daughter, go to California to live and take a rest; that she was depressed and tired and desired to avoid the trouble and worry of handling her business affairs; that she had no bank account and desired to open one; that she had confidence in the daughter and wished to arrange for a bank account so that the daughter could draw checks against the account without bothering the plaintiff, and also in order that if anything happened to her, the daughter would have access to the money so deposited. According to Mr. Fousek's testimony, he fully explained how a joint account could be opened by which the plaintiff and the daughter, Lillian Ludwig Hutchison, or either of them could make deposits to the account and draw checks against it without the cooperation of the other. The plaintiff and the daughter were then taken to the teller's window by Mr. Fousek and introduced to the teller where the initial deposit of $250 was made and a pass-book prepared and delivered to the depositors. At the same time a signature card, which contains the joint contract of the parties, was shown and explained to both the plaintiff and the daughter, signed by both and returned to the teller and thereafter placed in the files of the bank. There is practically no conflict as to the facts. The controversy arises over the legal effect of certain acts of the parties and their agents.

Plaintiff's motion to strike certain portions of the answer was denied. The affirmative parts of the answer were denied by the reply. The action came on for hearing before the court sitting without a jury, a jury having been expressly waived by both parties in open court.

When plaintiff's case in chief was in and plaintiff had rested, the defendant moved for a nonsuit, which the court denied. When all the evidence was in and both parties rested, the court made an order overruling all objections to the introduction of evidence made during the trial and upon which the court had

reserved its ruling at the time, directed that briefs be submitted, and, in due course, found all of the issues "in favor of the defendant and against the plaintiff' and allowed costs to the defendant. Judgment was entered accordingly, and from such judgment the plaintiff appeals.

Twenty-four assignments of error are specified. We deem it unnecessary to set these assignments out in detail or to consider them separately. As we view the matter, the ultimate question to be determined is whether or not the defendant violated any legal obligation due the plaintiff by the defendant in paying to the daughter $25,000 out of the joint account on a check against that account signed by the daughter only. In arriving at the solution of the controversy we proceed in accordance with the established rule of law often reiterated in this jurisdiction that the judgment of the trial judge will be presumed to be correct (*Smith* v. *Collis*, 42 Mont. 350, 112 Pac. 1070, Ann. Cas. 1912A, 1158), "and every legitimate inference will be drawn from the evidence to support this presumption." (*Langston* v. *Currie*, 95 Mont. 57, 26 Pac. (2d) 160, 165, and cases cited.)

As a background to the controversy, these facts are set out: H. W. Ludwig, Sr., died intestate May 25, 1937. He was survived by his wife, the plaintiff, a daughter Lillian Ludwig Hutchison, and two sons by a former wife who were associated with him in the garage business in the city of Great Falls. It appears that H. W. Ludwig, Sr., and the two sons H. W., Jr., and Ernest E., each owned a one-third interest in two garages— The Ludwig Garage and the Ludwig Motor Company. The senior Ludwig had been ill for several months and the daughter, residing at Los Angeles, California, had come on at the urgent request of the plaintiff to be with her during the father's illness.

On the death of Mr. Ludwig, Mrs. Hutchison at the instance of the plaintiff, phoned Mr. Hutchison to come to Great Falls by plane at once to assist the two women in settling the business affairs of the deceased husband and father. Hutchison demurred at first and advised that the plaintiff obtain the services of a competent attorney to look after her interests in the estate.

He was urged to come and assured that he would be more than compensated for any loss he sustained by being absent from his place of business. Mr. Hutchison finally consented and arrived in Great Falls by plane June 2, 1937. Soon after his arrival the plaintiff, Hutchison, and Lillian Ludwig Hutchison went to the office of Church and Jardine where the following power of attorney was prepared and delivered to Hutchison:

"Know All Men by These Presents:

"That I, Ella Ludwig, of the City of Great Falls, Montana, have made, constituted and appointed and do hereby make, constitute and appoint Juan C. Hutchison, of Hollywood, California, my true and lawful attorney for me, and in my name and on my behalf, to receive and receipt for any and all sums of money or payments due or to become due to me, to deposit in my name in any bank or banks, any and all moneys collected or received by him; to act for me in any business in which I am now interested, including the business conducted in the name of the Ludwig Garage and Ludwig Motor Company, in the City of Great Falls, Montana, authorizing my said attorney to dispose of my one-third interest in and to said business or businesses in the City of Great Falls, Montana, which I acquired from my late husband, H. W. Ludwig, now deceased, upon such terms and conditions as he may think best and to make, execute, acknowledge and deliver such deeds, contracts or other instruments in reference to the sale of my said interest in said business or businesses, giving and granting unto my said attorney, full power and authority to do and perform all and every act and thing whatsoever, requisite or necessary to be done in and about the premises as fully to all intents and purposes as I might or could do if personally present, I hereby ratifying and confirming all that said Juan C. Hutchison shall lawfully do or cause to be done by virtue of these presents.

"In witness whereof, I have hereunto set my hand and seal this 7th day of June, 1937.

"(Jurat)                                    ELLA LUDWIG [Seal.]"

Hutchison's testimony and that of his wife taken on depositions relative to the facts leading up to the giving of this power

of attorney, and what was done thereunder, are of such importance in arriving at a clear estimate of the controversy that extended excerpts thereof are here recited:

Hutchison testified in part: "My wife called me on long distance telephone saying that Mrs. Ludwig felt it necessary for me to fly immediately to Great Falls, Montana, and there assist in the negotiations for the sale of an interest in the Ludwig garage, which holdings were far greater than she had anticipated, and * * * she felt I was the one person she could trust to deal with the boys for her. After the telephone conversation, I flew to Great Falls, Montana. Upon my arrival there, I examined deeds and bills of sale which were found in Mr. Ludwig's strong box after the funeral, made a cursory examination of the property involved and determined to seek the advice of competent local counsel. Mrs. Ludwig said that the year's illness of her husband, during which time she had nursed him constantly while herself in ill health * * * had left her in no condition to handle the affairs pertaining to her husband's estate. Mrs. Ludwig said she had intended to have my wife handle the affairs for her but that since they involved so much money she didn't think my wife was good enough in arithmetic to handle it. She told me that she wanted to place the entire matter of settling the garage business in my hands, together with all other business interests which she had in Great Falls, Montana. I told her that it would be best to let me advise her but that I felt the actual settlement of affairs should be handled by a local attorney whose integrity was above question. After making a number of inquiries, I visited the law offices of Church & Jardine and there spoke to Mr. Church who made a very favorable impression upon me * * * . I then arranged to have Mrs. Ludwig visit him along with my wife and myself, which visit I believe was effectuated the second day following my arrival. In Mr. Church's office, Mrs. Ludwig stated that she was much too tired to deal with the boys directly and that she wanted Mr. Church to draw up a power of attorney empowering me to have complete charge of all the business affairs. She stated that she did not want to have anything to do at all with it, and

she wanted everything put in my hands. Mr. Church drew up a power of attorney which I have already referred to, and Mrs. Ludwig read and signed it.

"The power of attorney was drawn in the offices of Church & Jardine, Ford Building, Great Falls, Montana, on June 7, 1937. I was in Great Falls, Montana, during the year 1937. My best recollection is that the period I was in Great Falls is from June 2, 1937, to June 22, 1937. I received moneys belonging to the plaintiff.

" * * * Moneys were handed over to my wife for deposit in the only bank account which Mrs. Ludwig had in Great Falls, Montana. I received moneys from the sale of the Ludwig Garage and the Ludwig Motor Company in the form of two checks, total $26,700.00. I turned the checks over to my wife who deposited them in the Montana Bank & Trust Co.

" * * * I told my wife to deposit the checks in the joint account of Ella W. Ludwig and Lillian L. Hutchison, which account was the only account I knew of in Great Falls, Montana.

" * * * I knew of no other account of any kind.

" * * * Mrs. Ludwig told me that an account had been opened so that my wife and Mrs. Ludwig could have a bank account through which to handle the affairs incident to the business that had to be settled in connection with the death of H. W. Ludwig, Sr., and that the account had been made a joint account so both my wife and Mrs. Ludwig could have access to it at all times and so that in the event something happened to Mrs. Ludwig my wife could have access to the money. Mrs. Ludwig said she had originally intended to have my wife handle everything, but when she saw how big the estate might turn out to be she wanted me to help them.

"Q. You will further state approximately when and where the consideration was received on account of the sale of the Ludwig Garage and Ludwig Motor Company. A. I don't remember the exact date, but it was the same day the checks were deposited in the joint account. The checks were received at Mr. Church's office in the Ford Building..

" * * *. An attorney, whose name I believe is Mr. Mc-Kenzie, handed the checks to Mr. Church, and Mr. Church, who was acting as Mrs. Ludwig's attorney, in turn handed the checks over to me without instructions.

" * * * I went with my wife over to the Montana Bank & Trust Co. Since I didn't know anybody in the bank, I turned the checks over to my wife and told her to deposit them in the account. The checks were turned over to my wife on the date they were received and deposited, just before she entered the bank.

"(Examination by cross-interrogatories.)

"I have not stated I received $26,700.00 as a result of the sale of Mrs. Ludwig's interests in the garage. I have stated I received $26,700.00 as the result of the sale of Mrs. Ludwig's and Lillian L. Hutchison's interest in the garage. I received this money in the form of two checks, I believe. My best recollection is that they were made payable to Ella W. Ludwig. * * *

"When my wife and I left Great Falls, I used the return portion of the round trip airplane ticket on the National Park Airways. * * * I knew, when I left Great Falls at that time, that my wife had withdrawn $25,000.00 from the Montana Bank & Trust Co. in Great Falls, Montana. * * * None of it was carried by either of us in cash. * * * "

Testimony, in part, of Lillian Ludwig Hutchison:

"I deposited $27,600.00 in the form of two checks; one I believe was for $10,000.00, and the other for $16,700.00. These two checks were given to Attorney Church by my brothers E. E. and H. W. Ludwig. Mr. Church in turn gave those checks to my husband, Juan Hutchison. He, in turn, gave the checks to me, and I deposited the two checks in the joint account of my mother and myself. The deposit consisted of $26,700.00

" * * * My husband told me to deposit the checks in the bank, which I did. I made withdrawals from the account in the defendant bank, by check.

" * * * The purpose of this check (for $25,000) was to pay myself $10,000 which my mother had agreed to pay me.

The additional $15,000.00 was withdrawn because I felt my mother was incompetent and I had reason to believe she would lose all cash she could get her hands on. I wanted to make it impossible for my mother to dissipate the money until I had an opportunity to secure legal advice as to what to do.

"In order to fully answer this question relative to the purpose of my withdrawal of the $25,000.00, I desire to explain.

"My mother all her life has been in a state of mental confusion, as far back as I can remember. * * * she has been married four times. She has been divorced three times. She has a child by each marriage.

"After my father's death, my mother solemnly agreed with me that, if I would sign the papers, I would receive $10,000.00 in cash just as soon as the garage deal was completed. She wanted to settle the deal, dispose of the house and go to California where my husband and I would manage her affairs and she would live.

" * * * It was after the opening of my father's strong box that my mother and I opened the joint account we had. My mother told me she wanted me to handle all of her affairs. I called my husband in California, at my mother's insistence, and in my mother's presence, I told my husband I wanted him to fly up at once—that my mother needed him. He objected * * * . I insisted and said he must come.

"When I called my husband on the phone he said, 'Why don't you get a good local attorney and have him settle it?' I repeated this to my mother, and she said, 'No, we can't trust any of these attorneys.' * * *

"My husband finally agreed to come, and he arrived, I believe, the following day by plane. When he arrived, my mother told him, in my presence, 'Now, don't worry, we will try and get the most we can out of this, and I will give you complete power of attorney first thing in the morning.' My husband told her that the first thing to do was to get a reliable attorney. The following day, the three of us went to Mr. Church's office in Great Falls, and while there my mother told Mr. Church she wanted him to prepare a power of attorney giving to my hus-

band complete authority to handle all of her affairs and sign all papers. Mr. Church did prepare a power of attorney, which my mother signed.

"My husband then started negotiations with my brothers. He reported to my mother that he had arranged a deal with my brothers whereby they would pay a substantial sum of money in cash for the garage and that my brothers would, in the deal, release all claims they had against the estate of my father. My husband also told her that my brothers' attorneys had required, as a part of the deal, that I sign quitclaim deeds. My mother had previously told me that she was going to see that I got $10,000.00 right away. On this occasion mother said, 'Honey, go ahead and sign the papers and I will see that you get $10,-000.00 just as soon as we get the money, and as soon as we clean up our affairs here, I am going to California with you and your husband,' * * * . I said, 'All right, that is agreeable with me, because I want to build a home right away.'

"The deal with my brothers was closed by my husband, acting for my mother. After the money was paid on the garage deal, information came to me that my mother had been deceiving me; that she did not intend to come to California as she had told me she was going to do, but intended to draw all of the money from our joint account in the bank and go to Canada to marry her brother's father-in-law, * * * . When I got this information, I asked my mother about it. My mother told me it was none of my business, * * * I then went straight to the bank and sent my $10,000.00 to California and deposited the $15,000.00, as I have already testified. The occasion of my sending my $10,000.00 to California was on a Saturday at 12:00 o'clock, just as the bank was closing. * * *

"On Saturday afternoon I tried to induce her (the plaintiff) to carry through our original plan and agreement. On Saturday night, she asked me to turn over to her all of the money, checks, books and everything I had. I said, 'I can't do that. I have already transferred the money, and it will be safe for you when you have finally made up your mind what you are going to do.' * * * I told her that she was in no condi-

tion, physical, or mental, to go to Canada  *  *  *  .  I told her that this proposed trip to Canada was silly and foolish; that my father had only been dead three weeks; that she was nervous and unstrung and if, at a later time when she was in better condition, she wanted to go to Canada, it would be all right with me.  *  *  *

"She demanded over and over again that I turn over to her all of the money in our joint account.  This I refused to do  *  *  *  .  On the following Sunday morning, she was somewhat calmed down.  She then told me that if I would turn over to her our moneys she would pay me $5,000.00 in cash, and further said, 'Maybe I will give you a note for $4,000.00 since I am not getting as much as I thought I would.'  I reminded her that she had agreed to pay me $10,000.00 at the time I signed the papers.  She said, 'Well, the house is not sold yet.'  I told her that the selling of the house had nothing to do with it that she had agreed to give me $10,000.00 out of the sale of the garage.  *  *  *

"In my answer so far to this question, I have related the partial background of the history of my relationship with my mother, because it has a direct bearing upon the purpose for the withdrawal of the money by me from our joint account in the sum of $25,000.00.  For the reasons I have given in my answer, my purpose was to see that my mother carried out her agreement with me to pay the $10,000.00 which represented the consideration for my having signed away all my interest in my father's estate and in the garage, and also to protect my mother against herself.  *  *  *

"Part of the money I withdrew from this account was turned over to my mother.  Through my attorney, R. Dean Warner, I paid to her $15,000.00, or more, the exact amount I don't at the moment remember.  No moneys were turned over to my mother except the moneys I paid to her through my attorney R. Dean Warner.  *  *  *

"For the $10,000.00 which belonged to me, I gave to my mother waivers, quitclaims and releases to all my right, title and interest in my father's estate and my part in the proceeds of the

sale of the garage to my two brothers. I also gave waivers, and releases and quitclaims to my two brothers which were required before the sale could be completed. \* \* \*

"On several occasions my mother had stated to me that she was going to see that I got $10,000.00 in cash as soon as the garage deal was consummated, for my share, \* \* \* but the deal with the garage finally arrived at the stage where it could not go through unless I signed certain papers required by my brothers' attorneys. I had a conversation with my mother at the home in Great Falls, there being present my husband, my mother and myself. My husband told my mother that my brothers' attorney was requiring that I sign papers before the deal could go through. \* \* \*

" \* \* \* I executed papers which I understood released all claims I had against either my two brothers or my mother.

"(Examination by cross-interrogatories):

"One of the withdrawals from this bank by me consisted of the sum of $25,000.00, and I believe, it was a draft on the Federal Reserve Bank at Helena, Montana. \* \* \*

"I did not take this sum with me when I left Great Falls for California in June, 1937. The $25,000.00 was deposited in the bank located in the Ford Building. I instructed the bank to transfer $10,000.00 of the money to my bank in Los Angeles and to deposit the balance in my name, which they did. \* \* \*

"Q. By what means of transportation did you leave Great Falls, Montana, in June, 1937, what was your destination, and on what day and hour did you leave? \* \* \*

"My mother, Mrs. Ella Ludwig, Mr. and Mrs. Hinkle, John Keever, Gretchen McCartney and Mrs. McCartney all went in two cars to the airport outside of Great Falls. My husband and I rode in my mother's car with her. I had told her the day before that I had sent my money to California and that I had the rest of the money where she couldn't get a hold of it, but that she need not worry because as soon as she returned from this crazy trip to Canada it would be all intact for her. That I was leaving her over $1,000.00 in the original account for expenses \* \* \* .

"My husband had originally planned on returning to his business in Los Angeles by plane alone, and I had planned on leaving Great Falls and driving my mother to Los Angeles in her car, leaving a couple of days later, but my mother had come out with the plan that she was going to Canada by herself on what I considered a very foolish journey. It was then that I forwarded my $10,000.00 to California and deposited our $15,000.00 in the bank in the Ford Building (the Great Falls National Bank). My mother knew, because I told her, that the money was transferred where she couldn't get hold of it. * * * "

The following testimony of Louis Fousek, cashier of the defendant bank, in our judgment established the agency of the Lillian Ludwig Hutchison to look after the plaintiff's affairs in any transaction had with the defendant:

"My name is Louis Fousek. I am Cashier of the Montana Bank and Trust Co. I have held such position for about a year and a half. I was Cashier during the year 1937. I am acquainted with the plaintiff. I remember she was in the bank on or about the 28th day of May. A conversation took place between Mrs. Ludwig and myself at that time, at which Mrs. Ludwig, her daughter, Lillian Hutchison and myself were present. It took place at my desk in the bank, in the front part of the bank. * * *

"Mrs. Ludwig came in with her daughter. She stated, or rather, she asked me if it would not be possible for her to open a checking account in our bank in such a manner that the daughter could have complete charge. She stated that the recent illness of her deceased husband had been a very serious strain, and this, coupled with the grief of his passing and death, made her very nervous, tired and distraught. For that reason, she was placing all her affairs in the hands of her daughter for disposition, and she wanted to know if I could not possibly open an account for her in such a manner that the daughter could have complete charge of the account without requiring Mrs. Ludwig's presence, attention or signature.

"  *  *  *  .  She  also inquired if it would be possible to see that her safety deposit box could be handled in the same manner, and I told her it would be possible for us to arrange both the safety deposit box and checking account as she wanted it. *  *  *

"I inquired whether she wanted the right of survivorship on her safety deposit box and her checking account, and she said she did.  She stated that Mr. Ludwig had had a box in another bank in town, and she had authority to sign as agent, but she had never gone into the box at any time while he was alive, but she found out when he died that her agency had ceased and she didn't want her affairs to become so involved in case she should die.  So I told her that, in order for that to be carried out, we would have to open a joint account with the daughter, giving both equal rights with the right of survivorship.

"She told me the reason she brought the account to our bank was the fact for several years past I had extended her many small favors and courtesies, and she appreciated it, and for that reason, she wanted the account at the bank at which I was employed.  She said she had never had a checking account before with us.  She told me it was her plan to dispose of all her properties and effects in the city, and that she needed a rest very badly and planned on going to California with her daughter a few months until she was rested up, and after that she said she would visit other relatives.  *  *  *

"There was no specific amounts or certain properties designated.  She merely said she was disposing of all her holdings in the City of Great Falls.  What they were, I didn't know. *  *  *

"She told me at that time she had the utmost confidence in her daughter, and for that reason she was placing all her affairs in her hands.

"She told me her daughter's husband was coming up by plane the next day to assist the daughter in handling Mrs. Ludwig's affairs.  She told me her daughter's husband was a well-educated man, and he was a son of a man who previously was

connected in a big capacity with the—I believe, the Edison Company—and stated that he had lots of business experience and would be able to handle her affairs. * * *

" * * * She said she had confidence in the son. She wanted the son to come up and assist the daughter. * * *

"I accompanied Mrs. Ludwig and her daughter down to the Teller's window, Mr. Lytle's window, who handles the checking accounts. I instructed Mr. Lytle that Mrs. Ludwig desired to open an account in such manner that her daughter could have complete charge, and that he should use the joint account signature card with right of survivorship, and I also told him she was placing her affairs in her daughter's hands, and her daughter was going to handle this account entirely herself. * * *

"And I met them over at the customer's desk in the center. Mrs. Hutchison had brought over the signature card which she had already signed, and Mrs. Ludwig, at the customer's desk, affixed her signatures in the proper places, * * *

"Q. When did you next see Mrs. Ludwig, the plaintiff here? A. I didn't see Mrs. Ludwig again until the 21st of June.

"Q. Did you have any conversation with her at that time? A. Yes, I did.

"Q. Can you recall what that conversation was? A. Well, she came into the bank with her pass book and her check book and requested to know what balance she had in the bank to her credit. Defendant's exhibit 5 is the same pass book she brought with her. She also had a check book. I instructed Mrs. Ludwig to come in and sit down, and I went back to the bookkeeping department and got out the statement sheet, also the canceled checks, and brought them up * * * , and showed them to her. The statement sheet, of course, reflected the balance she had on deposit at the previous day's close of business. Defendant's Exhibit 7 is the same statement I showed her on that occasion.

"We checked over the checks—Mrs. Ludwig looked them over —and I found out from the check book she had there was three or four checks still outstanding that had been written on this

account according to the stubs of the check book but had not been presented for payment, and I went back to the bookkeepers and found three checks were in for that day's business, but were not posted.

"I showed those three checks to Mrs. Ludwig and asked her if she wanted them paid, and she said yes, she wanted those three checks paid.

"The Court: Who had signed those checks?

"Witness: Lillian Ludwig Hutchison. As I recall, one of the checks was for $50.00, and one was for $300.00, but I don't recall the amount of the other, but there were three. I can see, from this statement, there was another check for an additional $25.00.

"She then asked me about what her daughter had done with the $25,000.00 that had been drawn out of the account, and I told her that I didn't have any idea what the daughter had done; that she had come in and purchased a draft for $25,000.00, and what she had done with the draft was beyond my knowledge.

"She wanted to know who was supposed to be looking after the $25,000.00 that had been drawn out of the account, and I told her that I didn't have any idea what the daughter had done; that she had come in and purchased a draft for $25,-000.00, and what she had done with the draft was beyond my knowledge.

"She wanted to know who was supposed to be looking after her affairs. I told her that it was my understanding that her daughter was supposed to be looking after her affairs. We computed the balance and left enough in there to pay the three checks that were in for that day, and drew a counter check for the balance, and transferred that to a new account under the name of Ella W. Ludwig with no other signature but hers authorized. She stated at that time she wanted the account closed as far as her daughter was concerned. * * *

"The balance that she put in the new account remained in the bank for a period, I should say, of about two months. She stated that she wanted these checks that had been drawn on

this account that had not yet come in paid, and at the time we closed the account, there was still another check outstanding for approximately $50.00 that her daughter had issued and entered on the stub of her check book but had not been presented to the bank, and I stated to her, under the circumstances, we would have to return that check when it was presented. * * * . She told me not to do that, but to charge it against the new account; that she wanted that check paid. That was done.

"A few days after she closed the checking account, she came in and closed her safety deposit box, and transferred its contents to a new box issued in her name only. She came in the bank once or twice afterwards. She was in there sometime after the 1st of July to call for her monthly statements of her account, including the canceled checks.

"I asked her at that time if she had obtained a settlement with her daughter, or a refund. She stated that she had not, and she seemed visibly distressed, and told me that, as near as I can remember her exact words, she said, 'You know, Mr. Fousek, I had promised my daughter $10,000.00 to build a home, and I would gladly have given her $20,000.00 if I thought she needed it, but the fact she took this money without my consent is something I cannot understand and I am going to make her return every penny.' * * *

"There was an initial deposit of $250.00; another deposit June 14 of $112.50; and, the third and last deposit was made June 17 for $26,700.00. I don't recall that Mrs. Ludwig ever had an account at the bank prior to June 21, 1937. I did not receive the deposits that were brought in. * * *

"Q. Subsequent to the time this account was opened, Mr. Fousek, had the mother at anytime advised you that the daughter had no authority to make withdrawals from the account? A. No. * * *

"Q. At the time the daughter came in to make the $25,-000.00 withdrawal, Mr. Fousek, I believe you dealt with her, did you not? A. Yes.

"Mr. Norskog: Objected to on the ground it was not shown to be in the presence of the plaintiff, or even with her knowledge. * * *

"A. She told me that they had practically completed Mrs. Ludwig's affairs, and that they were leaving for California, and she wanted a draft for $25,000.00 to take this money to California. I told her we had no correspondent banks in California, but I could give her a Federal Reserve bank draft payable at any branch of the Federal Reserve system, which I did. * * *

"The two checks for this $26,700.00 were received by the bank. They were deposited to Mrs. Ludwig's account, the account of Ella W. Ludwig and Lillian Ludwig Hutchison. They were cleared in the regular manner to the paying bank. All money in that account has been checked out by the authorized signatures of Lillian Ludwig Hutchison and Ella W. Ludwig. We have no part of the monies or proceeds of these two checks. The account was closed on the 22nd of June, on our books. The checks were not personally endorsed, but our Teller stamped them 'Credit to the account of the within named payee.' "

This testimony taken in connection with surrounding circumstances in our opinion overcomes any evidence in conflict therewith, and establishes, amongst other things, two important facts—both arising out of the dual relation existing between Lillian Ludwig Hutchison and her mother, the plaintiff. First: Mrs. Hutchison was the mother's agent to look after her business affairs. The mother, by reason of her acts and her statements to Fousek, led Fousek to believe she had made the daughter her agent. (Sec. 7933, Rev. Codes; *Hartt* v. *Jahn,* 59 Mont. 173, 182, 196 Pac. 153.) The daughter's authority to act as the plaintiff's agent in any such transactions as those involved here may be granted orally, (sec. 7939, Rev. Codes; 2 C. J. S., Agency, 1044, sec. 20), or may be implied from the words and conduct of the parties and circumstances of the particular case "notwithstanding a denial by the alleged principal." (2 C. J. S., Agency, 1045,

sec. 23.) Second: The other phase of the dual relation existing between the mother and the daughter arises out of the joint deposit agreement, and in one or the other of the two capacities mentioned practically all of the vital acts and transactions had between Lillian Ludwig Hutchison and defendant bank, and complained of by the plaintiff, were done.

We think it becomes clear that, if the plaintiff has been injured in any particular by the withdrawal of the $25,000 paid out on the check of Lillian Ludwig Hutchison, it is an injury suffered by reason of the acts of plaintiff's own agents duly authorized by her either by express contract or by conduct from which we are of the opinion the defendant had a right to presume the daughter was the duly authorized agent of the mother, and the mother may not now deny the daughter's agency. If the mother suffered injury by any act of the daughter, it was not an injury that may be charged to the defendant, but one that resulted from the exercise of the power the mother had placed in the hands of the daughter. This we think brings the plaintiff under the provisions of the maxim that ''Where one of two innocent persons must suffer by the act of a third, he, by whose negligence it happened, must be the sufferer.'' (Sec. 8772, Rev. Codes.)

We think that the testimony recited and what we have said thus far reduces the controversy to the following questions:

1. Did Hutchison exceed the powers vested in him by the power of attorney when he directed his wife to deposit the checks in the joint account?

2. The checks being payable to the plaintiff or her order, was the endorsement of her signature thereon necessary before they were deposited?

3. Did the admission of the testimony of I. W. Church, over objection, violate the confidential relation between attorney and client that attorneys are enjoined by statute to respect? (Rev. Codes 1935, sec. 10536.)

4. Did Mrs. Hutchison exceed her legal powers in withdrawing $25,000 from the joint account by check signed by herself only?

1. Taking these questions up in the order mentioned, the scope of Hutchison's authority is clearly expressed in the power of attorney heretofore set out in full. By that instrument his authority to sell the plaintiff's interest in the two garages, execute and deliver the necessary instruments of conveyance to the purchasers, collect the purchase price and deposit same in some bank to the credit of the plaintiff, is as full and complete as if the plaintiff had the power to do those same things herself.

The only question that plaintiff has raised as to the legality of Hutchison's acts that has any color of merit, is that the deposit of the $26,700 was made to the joint account of the plaintiff and her daughter instead of to an account of the plaintiff alone. The power of attorney provides that deposits be made to plaintiff's credit, and she denies that the deposit in the joint account was a deposit to her credit. Such contention must be weighed in the light of what the plaintiff said at different times to her daughter, to Hutchison, to Church and to the bank officials to the effect that she was turning all of her affairs over to the daughter. That the plaintiff intended to give but little, if any, attention to her business affairs was shown by the record to have been repeatedly expressed to a number of persons at various times, and was emphasized in her conversations with Hutchison and the daughter; plaintiff expressly emphasized in her conversation with the defendant's officials on May 28, when she and the daughter arranged for the joint bank account, that it was an act done in connection with the handling of her estate and she desired to arrange for a joint account in order that the daughter could attend to the plaintiff's business without bothering plaintiff about the matter. This view of plaintiff's expressed purpose finds further corroboration in the joint contract on the signature card.

Recalling such expressions of intention on the part of the plaintiff, it was a most natural act for Hutchison to direct the checks be deposited in the account that plaintiff had provided for that purpose. If Hutchison had opened an independent account in the sole name of the plaintiff, it would have been

necessary to "bother" the plaintiff about a matter that she had plainly stated she desired to escape by opening the joint account.

By providing in the power of attorney that any money coming into Hutchison's hands should be deposited to plaintiff's credit in "any bank or banks," it would appear that the plaintiff intended to grant to Hutchison broad discretionary powers in selecting a depository for the funds collected and if he had chosen to send the checks to the Bank of England, or any other bank, it could not be said that he exceeded his powers. Hutchison chose the only bank and the only account that plaintiff had herself provided in which to make any deposit, and we think he exercised his powers in this regard with prudence and circumspection. Funds in the joint account were under the control of the plaintiff as fully as under the daughter. In fact, plaintiff issued a check for the balance, $1,340, left in the account after the checks drawn by the daughter had been cashed.

2. Was plaintiff's endorsement on the checks necessary? Hutchison's power of attorney was broad enough to authorize him to make the endorsements. Whatever is necessary and proper to carry into effect that which is expressly authorized in a power of attorney is within the scope of the power granted. (*In re Estate of Nix,* 66 Mont. 559, 213 Pac. 1089.) The power to deposit carried the implied power to do such acts as were necessary to make the deposit.

Furthermore testimony was admitted in evidence establishing the fact that a custom exists amongst Great Falls banks by which a rubber stamp is used by the receiving bank on unendorsed checks presented by others than the payee for deposit to the credit of the payee, and the words "Credited to account of payee—endorsement guaranteed," are stamped on the back of such checks, and that was done in the instant case. We think the plaintiff ratified the deposit of the checks in the defendant bank, and all things done in that connection by checking against the account herself, and by ratifying the acts of the daughter in drawing other checks against the account.

3. Was Church's testimony, admitted over objections, in violation of the alleged confidential relations existing between

him and the plaintiff? Under the rule laid down in *Piersky* v.
*Hocking*, 88 Mont. 358, 374, 292 Pac. 725, we think not.
Church's testimony was on the statements of the plaintiff made
to him in his office in the presence of Hutchison and Hutchi-
son's wife to the effect that the plaintiff was arranging to sell
all her property in Great Falls and was turning her affairs
over to her daughter to attend to; that she did not want to be
bothered, was tired and wanted to take a rest. Such statements
or conversation were not necessary to enable Church to prepare
and attend to the execution of the power of attorney which
appears to have been the only service he rendered the plaintiff.
Church testified that he assumed that he was acting for both
Hutchison and the plaintiff, but the record shows that Hutchi-
son first contacted Church and later took the plaintiff and the
daughter to Church's office on the occasion when the power of
attorney was prepared and executed.

Other legal matters relating to settling the estate attended
to by Church appear to have been attended to at the instance
of Hutchison, and when the checks received in payment for the
garages were delivered they came through the hands of Church
direct to Hutchison. Church's fee was paid by a check on the
joint account drawn by Lillian Ludwig Hutchison. In addi-
tion to these facts the matters that Church testified to were in
substance the same statements that the plaintiff had made to
Church in the presence of Hutchison and his wife, and, on
another occasion, had made to Fousek and Lytle at the defend-
ant bank, and statements made to a number of persons or within
their hearing cannot be said to be of a confidential nature. (See
Wigmore on Evidence, secs. 2310, 2311.) When a party himself
ceases to treat a matter confidential, we think it loses its confi-
dential character. The plaintiff suffered no injury by the rul-
ing of the trial court in this matter.

4. Did Mrs. Hutchison exceed her powers in withdrawing the
$25,000 from the joint account? Section 6014.53, Re-
vised Codes, provides: ''When a deposit has been made, or shall
hereafter be made, in any bank, in the names of two (2) persons,
payable to either or payable to either or the survivor, such
deposit, or any part thereof, or any interest or dividend thereon,

may be paid to either of said persons, whether the other be living or not; and the receipt or acquittance of the person so paid shall be a valid and sufficient release or discharge to the bank for any payment so made."

When the plaintiff and her daughter opened the joint account at defendant bank, a signature card was presented to and signed by both, returned to the teller and placed in the bank's files. Amongst other matter printed on such card is the following: "Joint Account—Payable to Either or Survivor.

"We agree and declare that all funds now, or hereafter, deposited in this account are, and shall be our joint property and owned by us as joint tenants with right of survivorship, and not as tenants in common; and upon the death of either of us, any balance in said account shall become the absolute property of the survivor. The entire account or any part thereof may be withdrawn by, or upon the order of either of us or the survivor.

"It is especially agreed that withdrawals of funds by the survivor shall be binding upon us and upon our heirs, next of kin, legatees, assigns, and personal representatives.

"Payment to or on check of the survivor shall be subject to the laws relating to inheritance and succession taxes and all rules and regulations made pursuant thereto.

"Witness:

"LILLIAN LUDWIG HUTCHISON    [Seal.]
"ELLA W. LUDWIG                    [Seal.]"

Another form of contract was printed on the same signature card with the following heading: "Joint Account—Two or More Signatures Required." This form of contract was left blank, leading to the conclusion that a joint account was not desired that required the signature of both the plaintiff and the daughter when funds should be withdrawn. The signature card contains a plain contract signed by both the plaintiff and the daughter who withdrew the $25,000 from the joint account in the defendant bank. When Lillian Ludwig Hutchison drew the check and presented the same to the defendant bank, the bank was legally bound to pay the amount to her. Had the bank

refused payment, it would have done so in violation of its contract and would have been liable in an action for damages.

"Contracts providing that payment of a joint bank account shall be made to either or the survivor are valid and supported by a valuable consideration. * * * Where no other evidence of intent is available, the form of the deposit may control; but when such intent is evidenced by a written agreement, the question of intention ceases to be an issue and the courts are bound by the agreement. * * * Withdrawals by one joint depositor, even if made without the consent of the other, do not change the status of the parties." (9 C. J. S., Banks and Banking, sec. 286. See also *American Nat. Bank* v. *Gordon*, 140 Or. 431, 14 Pac. (2d) 274, and *Hill* v. *Badeljy*, 107 Cal. App. 598, 290 Pac. 637, 640.)

In the latter case it was said: "The question involved in cases of this character is the intention of the parties making the deposit, and where such intention is evidenced by a written agreement, as was done in the case at bar, this question of intention ceases to be an issue, and the courts are bound by the written agreement. * * * Furthermore, in any action between the depositors or the bank during the lifetime of both depositors, in the absence of fraud or mistake, parol evidence is not admissible to change the terms of the legal effect of such a written instrument where it is in no respect uncertain or ambiguous." (Citing cases.) We find no errors in the record nor merit in any of the contentions of the plaintiff.

The judgment is affirmed.

MR. CHIEF JUSTICE JOHNSON:

I concur in the above and foregoing opinion, with the following observations:

It was alleged in the complaint and denied in the answer that plaintiff was the owner of the two checks in question. Apparently no request was made for express findings, but in the judgment it is recited that the court "finds the issues in favor of the defendant and against the plaintiff and the judgment should be given and made herein accordingly."

It seems clear from the record that the court was not unjustified in finding that the checks in question did not belong entirely to Mrs. Ludwig, but belonged partly to Mrs. Hutchison, and that the latter's interest in them was apparently not less than the amount of $9,504.48 sued for by the plaintiff.

Both Henry W. Ludwig, Jr., and Ernest F. Ludwig, the purchasers of the undivided one-third interest in the garages, testified that the $26,700 represented only a portion of the purchase price; and the testimony also showed that as part of the transaction they released all claims upon their father's estate, and that before completing the purchase they required like releases and also quitclaim deeds from Mrs. Hutchison. Apparently, therefore, their purchase included the latter's interest.

In her discussion with Mr. Fousek relative to a joint banking account, and relative also to a joint safe deposit box, Mrs. Ludwig referred to the fact that she had had authority as an agent to enter her husband's safe deposit box in another bank, but found that it was terminated by his death and that she was not permitted access. The testimony also shows that after the death of H. W. Ludwig, Sr., unrecorded and apparently undelivered deeds and bills of sale were found in his safe deposit box and that Mrs. Ludwig then said to Mrs. Hutchison: ''Oh, he made out deeds and bills of sale, but they are not recorded. Now, the boys can come in for their share because these papers were not recorded previous to Dad's death. * * * He [Mr. Hutchison] must come up because since these papers haven't been recorded we are bound to have a lot of trouble with these boys, and the local attorneys are liable to join in with them.'' Apparently, in addition to the house and the garage interests, the estate of Mr. Ludwig consisted only of $165.73 cash in bank and $866.15 insurance proceeds.

In the state of the record it seems that the two sons, who with their father had owned the Ludwig garages, undoubtedly took these facts into consideration in purchasing the outstanding one-third interest. It is not entirely clear whether there were any other heirs, but it would seem that in any event Mrs. Ludwig was entitled to only one-third of the father's share, and that the remaining two-thirds thereof became the property of the

other heirs, including at least Mrs. Hutchison and her two half-brothers, and possibly also Joan Ludwig, whom Mrs. Hutchison mentioned as her half-sister. Undoubtedly the two brothers took their own interest as heirs into consideration in making the purchase. If there were no other heirs, it would seem that the $26,700 represented Mrs. Ludwig's one-third interest in the estate and Mrs. Hutchison's two-ninths interest, so that only three-fifths of the $26,700 belonged to Mrs. Ludwig. If Joan Ludwig was an heir and her one-sixth interest was included, the $26,700 represented in addition Mrs. Ludwig's one-third interest and Mrs. Hutchison's one-sixth interest, so that only one-half of it belonged to Mrs. Ludwig. The burden being upon plaintiff to prove ownership in that portion of the checks represented by the money sued for, and plaintiff not having explained away Mrs. Hutchison's apparent interest to the satisfaction of the trial court, it cannot be said that the court was in error in finding against her upon that issue.

There was further testimony by Mr. Fousek as well as by Mr. and Mrs. Hutchison to the effect that Mrs. Hutchison was to receive $10,000 as soon as the garage deal had been completed, though whether by reason of her interest in her father's estate or otherwise does not appear. Mrs. Ludwig denied this but did not deny a number of other statements collateral thereto, and it cannot be said that the district court erred in refusing to accept Mrs. Ludwig's testimony upon the point rather than that of the other three witnesses. This is particularly true in view of Mrs. Ludwig's denial that at the time of opening the account she had any idea of disposing of the garage interests, although apparently the negotiations were then in progress and at about the same time she was requesting Mr. Hutchison to come to Montana to help in the negotiations, having found the property interest more considerable than had been expected.

In view of Mrs. Hutchison's apparent interest as an heir of her father, or under her mother's promise as to the $10,000, or both, it seems clear not only that the trial court was justified in finding that plaintiff had not established her right to the money in controversy, but also that Mrs. Ludwig was apparently not prejudiced by the transactions in question.

If Mrs. Ludwig was entitled to judgment in this case, it would be because her son-in-law, to whom she gave power of attorney to dispose of the garage interests and to deposit the proceeds in her name in any bank, had, in order to defraud her, improperly caused the proceeds to be deposited in the joint account, and because the bank had performed an act or default contributing to such fraud by accepting the checks for deposit without endorsement by Mrs. Ludwig or her attorney in fact. This suggests the further query what the bank's duty would have been had the checks been so endorsed when presented for deposit, or had the deposit been in cash. But these questions are automatically eliminated because of the fact that there is ample credible testimony in the record, which the trial judge apparently believed and was entitled to believe, showing that no fraud was committed in depositing the checks in the joint account, for the reason that they constituted the joint property of Mrs. Ludwig and Mrs. Hutchison, and that in any event the amount in suit does not exceed the latter's interest therein.

It seems to me, therefore, that regardless of the technical question whether the defendant should have accepted the checks for deposit in the joint account without an endorsement by Mrs. Ludwig or by Mrs. Hutchison as her attorney in fact, there is not sufficient evidence in the record to indicate that Mrs. Ludwig has been injured by the transaction; and that the district court was not in error in finding the issues and entering judgment for the defendant.

MR. JUSTICE ARNOLD:

I concur in the above views of the Chief Justice.

MR. JUSTICE ANGSTMAN, Dissenting:

I do not find in the record any evidence justifying the action of defendant in depositing the checks aggregating the sum of $26,700 in the joint account of Mrs. Ludwig and Mrs. Hutchison thereby making it possible for Mrs. Hutchison to withdraw the funds. The only evidence on the point as to the extent of the authority of Mrs. Hutchison to act as agent for Mrs. Lud-

wig, which was communicated to the bank, came from defendant's witness Fousek, its cashier. That evidence was to the effect that Mrs. Ludwig opened a joint account in the bank with Mrs. Hutchison; that Mrs. Ludwig told him that "she was placing all her affairs in the hands of her daughter [Mrs. Hutchison] for disposition, and she wanted to know if I could not possibly open an account for her in such a manner that the daughter could have complete charge of the account without requiring Mrs. Ludwig's presence, attention or signature. * * * She told me it was her plan to dispose of all her properties and effects in the city, and that she needed a rest very badly and planned on going to California with her daughter a few months until she was rested up." The witness was then asked: "Did she say anything about what was to be done with the monies derived from the sale of the properties?" After objection was overruled, his answer was: "There was no specific amounts or certain properties designated. She merely said she was disposing of all her holdings in the city of Great Falls. What they were I didn't know." The answer, it will be noted, was not responsive to the question, and so far as the point involved is concerned, it might as well have been answered by saying, "No." Mrs. Hutchison corroborated Fousek as to what was said when the joint account was established.

Another witness for defendant, attorney I. W. Church, testified that plaintiff had told him she "had opened a small bank account in her joint name and that of her daughter, Lillian [Mrs. Hutchison], to take care of small, incidental bills. * * * They had opened up this bank account, and the daughter was to pay these small bills, as I understood, outstanding at that time."

The record also shows, and this is the best evidence of Mrs. Ludwig's intention, but this was not known to the bank at the time of depositing the checks in question to the joint account, that she had executed a power of attorney to Mr. Hutchison, her son-in-law, to sell her property in Great Falls, to receive and receipt for all moneys to be paid therefor, and "to deposit in my name in any bank or banks, any and all moneys collected or received by him." Had the bank known of this power of

attorney, it would not have been warranted in depositing the checks made payable to Mrs. Ludwig and not endorsed by her, in the joint account and thus making it possible for Mrs. Hutchison to receive the proceeds thereof for her own benefit. As well might the bank have made the deposit directly in the name of Mrs. Hutchison.

Payment of a check to one who is not a holder under the endorsement of the payee, is at the risk of the bank. (*Dawson & White* v. *National Bank of Greenville,* 197 N. C. 499, 150 S. E. 38; and compare *Singer Sewing Machine Co.* v. *Citizens' Nat. Bank,* 111 N. J. L. 199, 168 Atl. 32; *Weissman* v. *Banque De Bruxelles,* 221 App. Div. 595, 224 N. Y. Supp. 555; *Quanah A. & P. Ry. Co.* v. *Wichita State Bank & Trust Co.,* 127 Tex. 407, 93 S. W. (2d) 701, 106 A. L. R. 821; Id., (Tex. Sup.) 89 S. W. (2d) 385.)

I think this case is analogous to that of a bank depositing a partnership check to the credit of the personal account of one of the partners. In such case the bank is liable. (*McIntosh* v. *Detroit Sav. Bank,* 247 Mich. 10, 225 N. W. 628.) It has been held that where a bank receives a check for deposit, endorsed by the payee, together with a deposit slip directing the money to be credited to the account of the payee, it has no right to credit the deposit to the joint account of the payee and another. (*Continental Nat. Bank* v. *Neville,* (9 Cir.) 285 Fed. 565.) It is true that Mrs. Hutchison was made the agent of plaintiff with broad powers. But she was still plaintiff's agent, transacting plaintiff's business, and not that of her own.

As I have above stated, I find no evidence warranting a finding that that agency authorized the deposit of the funds represented by the checks in the joint account. If we assume that authorization to deposit proceeds of a check payable to one party to a joint account can be made orally and by conversation over the counter of a bank, the evidence must at least be clear, positive and convincing. Such evidence does not appear here.

I am unable to find in the record any suggestion that the trial court found that the checks totaling $26,700 were jointly owned by plaintiff and Mrs. Hutchison, as stated in the concurring opinion of the Chief Justice. No issue of joint ownership was

raised by the pleadings, and I find no evidence supporting such a conclusion. There is some evidence that plaintiff had promised to pay to Mrs. Hutchison the sum of $10,000, but if it be a fact that plaintiff owes Mrs. Hutchison $10,000, that would constitute no defense in this action. If plaintiff owes Mrs. Hutchison $10,000, she and not this defendant has the right to determine when it shall be paid.

I think it was error to enter judgment for defendant and that judgment should have been for plaintiff. It may be that if plaintiff owes Mrs. Hutchison $10,000, the bank has some other remedy, but that fact would not avail as a defense to this action.

MR. JUSTICE ERICKSON:

I concur in the above dissenting opinion of Mr. Justice Angstman.

Rehearing denied February 5, 1940.