**POTLATCH OIL & REFINING CO. et al.
v. OHIO OIL CO.**

No. 13010.

United States Court of Appeals
Ninth Circuit.

Oct. 30, 1952.

Rehearing Denied Dec. 3, 1952.

E. J. McCabe, E. J. McCabe, Jr., Great Falls, Mont., for appellants.

Louis P. Donovan, Shelby, Mont., W. H. Everett and John W. Gee, Casper, Wyo., for appellee.

Before DENMAN, Chief Judge, and BONE and POPE, Circuit Judges.

POPE, Circuit Judge.

Appellants, plaintiffs below, brought this action to procure an accounting of amounts alleged to be due them from the appellee-defendant under the terms of a so-called "Operating Agreement". This agreement was executed June 15, 1922 by the trustees of a "common law trust" known as Troy-Sweetgrass Oil Syndicate, and the defendant Ohio Oil Company. On the same date the Syndicate assigned to Ohio Oil Company, here called Ohio, a 55 percent interest in certain oil and gas leases covering lands in Toole County, Montana. By the Operating Agreement Ohio undertook to develop the leased lands for oil and gas purposes. Ohio was to market all oil and gas produced and account to Syndicate for the latter's 45 percent of the proceeds remaining after deduction of royalty oil and gas.

The agreement contained the following provision, the meaning of which was the primary question raised by the complaint: "[Ohio] will pay all costs and expenses of developing and operating said lands for oil and gas purposes, as herein provided, and shall charge the said party of the first part Forty-five (45%) percent thereof." Included in the "costs", a share of which were charged by Ohio under the quoted clause, were the following disputed items: the expense of a water plant, an overhead charge of ten percent, automobile expense, and the cost of constructing a camp.

In January, 1923, the Syndicate assigned half of its then interest in the leases and the Operating Agreement to another "common law trust"—Inland Empire Oil and Gas Syndicate—here called Inland. Again, on August 18, 1923, Syndicate assigned its remaining half interest to Potlatch Oil and Refining Company, a corporation, here called Potlatch.

By the early part of August, 1925 controversy had developed between Inland and Potlatch, on the one hand, and Ohio on the other, with respect to the manner in which Ohio was charging its costs of operation and accounting for the oil produced. In an effort to adjust and settle the dispute the parties had a conference at Shelby, Montana, on August 7, 1925 as a result of which it was agreed that the attorneys for Inland and Potlatch would reduce to writing and send to Ohio a statement of the items giving rise to the difference of opinion between the parties, and stating the objections of Inland and Potlatch to the accounts theretofore rendered.

Pursuant to that understanding the attorneys did under date of August 8, 1925 write such a letter to Ohio. The position taken in the letter was that the only charges authorized by the Operating Agreement "were simply the charges and expenses incurred within the four corners of the lease". It was asserted that the conversations between the parties prior to the signing of the agreement were to the effect that "there should be no charge * * * save and except the actual expense incurred on the lease itself". Particular objection was made to the items of cost above mentioned, and it was also asserted that Inland and Potlatch should have been credited with an additional 10¢ per barrel on the oil sold. Complaint was also made that drilling and other related costs had been excessive. The letter recited that the attorneys believed that it covered all points of dispute. In general it set forth the same matters which form the basis for the complaint in the action now before us.

On September 12, 1925 Ohio replied to this letter, item by item, explaining in considerable detail the views of Ohio with respect to each of them. The reply took the position that the charges as made were correct, that the oil had been properly accounted for and that the drilling costs were not excessive. In general the letter rejected all of the claims made. Thereafter Ohio continued to make the same kind of charges for the same items and to account for the oil in the same manner in which it had previously done until about January 31, 1943

when Ohio sold its interest in the leases to the Texas Company. On March 18, 1947 Potlatch and the Trustees of Inland filed their complaint in this action in the District Court of Toole County, Montana. The action was removed to the court below on the ground of the diversity of citizenship of the parties.

In its answer Ohio urged, among other defenses asserted, that the action was barred by laches and by the Montana statute of limitations. Ohio had judgment, the trial court sustaining several of its defenses including those of laches and the bar of the statute of limitations.

The complaint sets out the Operating Agreement by annexing it as an exhibit. It alleges that before the Operating Agreement was reduced to writing, there was an oral understanding that the agreement should provide that the costs to be charged against the share of Troy Sweetgrass Oil Syndicate, assignor of the plaintiffs, would be restricted and limited exclusively to the cost of the actual drilling of the wells at their locations on the lands plus the actual cost of the equipment located upon the lands and the actual cost of its installation, repairs and replacement; and that all other costs would be the sole expense of and chargeable to Ohio. It alleges that Ohio promised to reduce the terms of such oral agreement to writing; that it represented that a certain clause of the written agreement had accomplished the limitation of costs which had been agreed upon orally, and that plaintiffs' assignor, the Syndicate, executed the agreement in reliance thereon and believing that the costs had been limited and restricted in accordance with the oral understanding. The complaint further alleges that Ohio, contrary to the agreement of the parties and to the provisions of the Operating Agreement, had improperly charged the plaintiffs' shares with items of cost and expense aside and apart from the actual cost of drilling and installing equipment upon the land itself, and that it had failed to make proper accounting of the oil sold. It alleges that defendant's attention had been called to the erroneous charges and credits mentioned; that defendant expressly promised that these would be

rectified upon a correct and full final accounting to be made later; and that a true and correct accounting would disclose that a sum in excess of $175,000 was due to each of plaintiffs. The prayer was that defendant be required to render a full and true accounting under the Operating Agreement and upon such accounting it be ordered to pay the plaintiffs the sums shown to be due thereon.

Appellants speak of their action as one "to obtain a judgment requiring the appellee to account to appellants for alleged moneys received and improperly withheld from appellants in connection with certain oil and gas agreements theretofore entered into between appellants and appellee and to pay the appellants the amount determined * * * on such accounting." It is not altogether clear whether appellants consider their action to be one upon a written contract to be construed in the light of the alleged prior oral negotiations, or whether it is an action upon a written agreement modified or supplemented by an oral agreement, or whether it is an action to reform the written contract and to recover upon the same as reformed. The opinion, D.C., 96 F.Supp. 685, of the trial judge refers to it as an action brought to reform the written agreement.

The Montana statutes of limitation provide that "An action upon any contract, obligation, or liability, founded upon an instrument in writing", must be commenced within eight years;[1] that "An action upon a contract, account, promise, not founded on an instrument in writing" must be brought within five years;[2] and that "An action for relief on the ground of fraud or mistake", must be brought within two years after discovery of the facts constituting the fraud or mistake.[3]

Since the appellants, through their attorneys, made their written statement of their claims with respect to Ohio's obligations in 1925, which claims were rejected at that time, and since the present suit, setting up substantially the same matters which were discussed in the August 7, 1925 letter, was not commenced until March 18, 1947, it would seem at first blush that no matter what the theory of the complaint, the action must have been barred by limitations as the trial court held. However, the appellants contend that the action is not so barred for the reason that it did not accrue until 1943 when Ohio sold out to the Texas Company.

Appellants assert that prior to that time Ohio on the one hand, and Inland and Potlatch on the other, were joint adventurers in that they were engaged in an enterprise for profit undertaken by them jointly. They argue that "the relations between joint adventurers is fiduciary and each has the right to demand and accept from their associates utmost good faith and scrupulous honesty in all that relates to their common interest and each is forbidden to so act that his personal interest would be hostile to the other. The relationship is in the nature of trusteeship." Hence, it is argued, where a fiduciary acquires more than his proper share under the agreement, "he will be deemed a trustee for the benefit of his co-adventurer."

It is argued that under the Operating Agreement Ohio, by reason of the confidence reposed in it by the Syndicate, was given possession and control of the lands and it thus became a fiduciary. As a fiduciary it occupied a relation of trusteeship owing the duty to account correctly and honestly.

The appellants contend that this trust continued throughout the period from 1925 to 1943 and that as long as it continued, the possession of the trustee Ohio was the possession of the beneficiaries, the appellants. In State ex rel. Central Auxiliary Corp. v. Rorabeck, 111 Mont. 320, 325, 108 P.2d 601, 604, it is stated: "It is generally held that as between the trustee and the beneficiary of a trust, the statute of limitations does not run until the trust has been repudiated and notice of repudiation received by the beneficiary. * * * The rule is succinctly stated in 4 Bogert on Trusts and Trustees, § 951, as follows: 'The true

---

1. R.C.M.1947, § 93-2603.

2. R.C.M.1947, § 93-2604.

3. R.C.M.1947, § 93-2607.

rule with respect to the statute of limitations and express trusts is more clearly stated as follows: During performance of the express trust there is no cause of action for breach and so the statute of limitations has no bearing on the rights of the *cestui*; but, if the trustee violates the trust and the *cestui* knows of such conduct, or could have learnèd of it by the use of reasonable diligence, the court will apply the statute of limitations which governs equitable causes of action or an analogous statute concerning legal causes of action. To cause the statute to begin running during the life of the trust there must be some act of repudiation of the trust by the trustee, as where he declines to account to the *cestui*, takes trust income for his own purposes, or sets himself up as the owner of the trust capital' ".

The trial court held that "In 1923, 1925 and 1936, plaintiffs made complaint to Ohio with reference to the charges made by Ohio for expenses of operation and development and in each instance Ohio refused to make any changes in its charges as requested by plaintiffs and maintained a continuous and unvarying course of conduct throughout the entire period as established by convincing proof under which it flatly and unequivocally refused to make any such change. Ohio during all of said period steadfastly maintained that the charges and its accounting were in strict accordance with the terms and provisions of said agreement of June 15, 1922."

When, as we have stated, Ohio by its letter of September 12, 1925, rejected the complaints and demands contained in the August 8 letter of appellants' attorneys, it would appear that at that moment, even assuming that a trust relationship existed as urged by appellants, Potlatch and Inland must have known not only that Ohio, if appellants' version of the meaning of the agreement was correct, had violated the trust, but that it intended to continue to act in the same manner in the future. It is undisputed that Ohio did continue to make the same charges in the future, and that fact, together with the rejection contained in the letter mentioned, would appear to support and sustain the quoted finding.

The appellants, however, assert that other evidence offered would have disclosed facts requiring a different finding; that this evidence was excluded when the court refused to admit or to consider the testimony of one T. P. Jones who testified by deposition and whose testimony was rejected by the court as inadmissible under the Montana dead man's statute; and that this exclusion was error.

Jones had been a trustee of the Syndicate and its president and manager. He had executed on its behalf the Operating Agreement previously referred to. When the Syndicate sold its remaining interest in the agreement and the leases to Potlatch, Jones was an officer and director of Potlatch. In 1932 he ceased to be an officer or director but at the time he gave his deposition he was a stockholder of Potlatch.

Jones' testimony related to two separate occurrences. The first one was the occasion in the year 1922 when the witness and another representative of the Syndicate had certain oral negotiations with representatives of Ohio looking to the making of the arrangement which was afterwards incorporated in the Operating Agreement and the accompanying assignment of interest in the oil and gas leases.[4] The second purported occurrence was a conversation be-

---

4. This portion of Jones' testimony was to the effect that during the oral negotiations which preceded the drafting of the written agreement, he explicitly requested that a clause be inserted in the agreement expressly providing that costs such as those in dispute here should not be charged to the Syndicate; that the representatives of Ohio, consenting to that stipulation purported to insert a clause to that effect in the preliminary draft which had been prepared and that after the proposed contract had been rewritten it was shown to Jones and his attention called to a newly inserted clause which read "[B]ut in no case shall said party of the first part be finally held or charged beyond its share or interest in the production and equipment from, in or upon said lands". Jones testified that believing that this language accomplished the change demanded by him, signed the writing and did not learn until later that it had done no such thing. The court

tween himself and one John McFadyen, an employee of Ohio, whose position was that of "Division Manager Rocky Mountain Division". This conversation, he testified, took place at Shelby, Montana, at a time not otherwise specified except that it was subsequent to a meeting of the stockholders of Potlatch held in the year 1926. When the conversation was had the only persons present were Jones and McFadyen. Jones was purporting to speak as a representative of both Potlatch and Inland, as he was both a trustee of Inland and president of Potlatch. It is this purported conversation with McFadyen which is of significance here, for the appellants place great importance upon it as operating to modify or qualify what was stated by Ohio in its letter of September 12, 1925 previously mentioned or as giving rise to a promise to review the alleged overcharges and make a future accounting based upon the results of that review. The rejected testimony was as follows:

"Q. What did you say to him at that time in connection with this operation? A. I told him if he didn't correct these things and make an accounting, we would have to enter a suit against the Ohio Oil Company.

"Q. And what did he say? A. He told me—He said, 'Don't start no suit, because the Ohio Oil Company is responsible and reliable, and eventually in the final account we will fix this thing up and pay you anything that was overcharged against you. You can rest assured of that. The Ohio Oil Company is responsible and reliable.' He said, 'I will use my efforts to see that it is brought to a head without a suit.'

"Q. As a result of Mr. McFadyen's statement to you, what if anything did you do with respect to starting a suit? A. I didn't start any at all."

At the time of the commencement of the action McFadyen was dead. The Montana dead man's statute, R.C.M. 1947, § 93–701–3, provides in part as follows: "The following persons cannot be witnesses: * * *. 4. Parties or assignors of parties to an action or proceeding, or persons in whose behalf an action or proceeding is prosecuted against any person or corporation, as to the facts of direct transaction or oral communications between the proposed witness and the deceased agent of such person or corporation, and between such proposed witness and any deceased officer of such corporation, except when it appears to the court that without the testimony of the witness injustice will be done." So far as this statute is concerned it would appear to be clear enough that it would require the exclusion of this testimony of Jones. While Jones was not, at the time his deposition was taken or at the time of the trial, a party to the action, he would appear clearly enough to have been the assignor of both parties. The Syndicate was not a corporation but merely the name attached to what the appellants called a "common law trust". Jones and two other individuals were the trustees under that trust and Jones therefore was an assignor of the two plaintiffs in the action for he, as trustee, and the other trustees, made the assignments which passed the Syndicate's interest to Inland and Potlatch.[6]

So far as the Montana law is concerned, it is therefore clear that Jones was not a

---

below held that the language of the written agreement was clear and explicit; that the intention of the parties must be ascertained from the writing alone, and that it was not susceptible of explanation, interpretation or modification by parol evidence of the prior oral negotiations. The disposition which we make of this case makes it unnecessary to consider the propriety of this ruling.

5. F. E. Hurley, vice-president of Ohio, and A. M. Sellery, its "leaseman", who carried on the oral negotiations with Jones preceding the signing of the Oper-

ating Agreement, had also died prior to the commencement of this action.

6. Inland is also described as a "common law trust". At the time the original Snydicate assigned its interest to Inland Jones was also a trustee of Inland, (he described himself as a "director" of Inland). When, about 1931, he ceased to be trustee he must have thereupon transferred his interest as trustee to a successor trustee, and we would therefore consider that he was also an assignor of the present trustees of Inland.

competent witness to testify to his oral communications with McFadyen, the deceased agent of Ohio.

We next inquire whether under Rule 43(a) Fed.Rules Civ.Proc. 28 U.S.C.A., the testimony of Jones would be admissible "under the rules of evidence * * * applied in the courts of the United States on the hearing of suits in equity," [7] notwithstanding it must be excluded under the State rule. This is the question with which the court had to deal in Wright v. Wilson, 3 Cir., 154 F.2d 616, 170 A.L.R. 1237. There in a suit where the defendant died pending the litigation the plaintiff undertook to testify. Under the law of Pennsylvania, where the action in the federal court was tried, the testimony of the survivor plaintiff was prohibited. The inquiry was whether his testimony would be admissible under United States statutes or under the rules theretofore applied in federal courts on the hearing of suits in equity. The court held that the federal rule also excluded the proffered evidence saying, 154 F.2d at page 618: "At common law both the parties to a suit were incompetent as witnesses on the ground of interest. * * * More recently Jones in speaking of the same rule adds that it applied both in chancery and at law. And finally Wigmore succinctly emphasizes the fact that a disqualifying interest concept was behind the common law rule of exclusion of parties as witnesses. * * * The inevitable conclusion is that whatever door one tries it is firmly locked against the admissibility of the proffered testimony in this case. There never has been a federal rule admitting such evidence because the course of federal legislation has either been to make only incomplete changes in the original common law or to refer the matter to state law by which, as shown, the evidence is inadmissible. There is no help to be gained from the reference to suits in equity, the language used in Rule 43(a) because of lack of application and because the survivor rule principle applied in equity suits as well as actions at common law."

In the case just cited the witness held to be disqualified under the original common law and equity rules was the plaintiff himself. In the instant case Jones was not a party to the suit. His position was that of a stockholder in Potlatch and in that sense he was interested in the event of the litigation. The rule which disqualified a party to the suit also disqualified a witness who at the time was interested in the outcome of the suit.[8]

We think that this interest as stockholder would disqualify Jones under the rule discussed in Wright v. Wilson, supra.[9] That being so, what is so ably set forth in the opinion in that case sufficiently demonstrates that § 43(a) does not aid the appellants in respect to the competency of this witness. Cf. Lake Shore Nat. Bank v.

7. "Rule 43. Evidence (a) Form and Admissibility. In all trials the testimony of witnesses shall be taken orally in open court, unless otherwise provided by these rules. All evidence shall be admitted which is admissible under the statutes of the United States, or under the rules of evidence heretofore applied in the courts of the United States on the hearing of suits in equity, or under the rules of evidence applied in the courts of general jurisdiction of the state in which the United States court is held. In any case, the statute or rule which favors the reception of the evidence governs and the evidence shall be presented according to the most convenient method prescribed in any of the statutes or rules to which reference is herein made. The competency of a witness to testify shall be determined in like manner."

8. For a discussion of the history and policy of the rule disqualifying for interest see Wigmore on Evidence, III Ed., Vol. 2, §§ 575–577. See particularly that portion quoted in Wright v. Wilson, supra, note 12, 154 F.2d at page 618.

9. In a number of states the statutes disqualifying witnesses in a suit prosecuted by or against the personal representative of the decedent, extends the disqualification to "persons interested in the event". It is generally held under such statutes that a stockholder of a corporation which is a party comes within that exclusionary clause. See cases cited in notes 163 A.L.R. p. 1220 and 27 L.R.A.,N.S., p. 819; also Brown v. First Nat. Bank, 49 Colo. 393, 113 P. 483.

Bellanca Aircraft Corporation, D.C., 83 F. Supp. 795, affirmed 3 Cir., 178 F.2d 923.

It is urged, however, that the court should have admitted this testimony of Jones as to his conversation with McFadyen under the exception to the statute quoted above which recites that the testimony of a party or assignor of a party may be received "when it appears to the court that without the testimony of the witness injustice will be done". Appellants assert that the trial court abused its discretion in refusing to admit the testimony under this exception.

■ The Montana rule, however is that a trial court should not admit the testimony of such a witness " 'until sufficient other testimony has been admitted to warrant the court, in the exercise of its discretion * * * in favor of the questionable testimony.' " Phelps v. Union Central Life Ins. Co., 105 Mont. 195, 203, 71 P.2d 887, 891; cf. Langston v. Currie, 95 Mont. 57, 71, 26 P.2d 160; Cox v. Williamson, 124 Mont. 512, 520, 227 P.2d 614.

There was no such foundation for the exercise of any discretion to admit this testimony of Jones as his testimony is the only thing in the entire record relating to that conversation.[10]

In expressing its reasons for not interfering with the exercise of the trial court's discretion where testimony of this character has been rejected, the Montana court has frequently commented upon the weak and unsatisfactory character of testimony concerning oral conversations between the surviving witness and a person now deceased. Thus in Cox v. Williamson, supra, the court quoted from one of its earlier decisions as follows, 124 Mont. at page 522, 227 P.2d at page 620: "Every judge has observed the freedom with which a witness testifies who knows he cannot be contradicted. Courts should scrutinize with more than usual care the quality of proof presented in such cases, and when the testimony relates to oral communications between the witness and the deceased, it must be viewed with caution."[11]

10. An examination of the Montana cases indicates that the required foundation testimony must itself be corroborative of the offered testimony of the witness. In Cox v. Williamson, supra, which is apparently the latest decision of the court dealing with this aspect of the Montana dead man's statute, the court held the foundation testimony there given inadequate for while other witnesses had testified to declarations and admissions of the decedent relating to some aspects of the matters to which the survivor proposed to testify, yet they did not testify to the precise contract or agreement which it was sought to establish by the survivor's testimony. The court said in 124 Mont. at page 522, 227 P.2d at page 619: "The trial court should not admit the testimony of such a witness until sufficient other independent testimony has been admitted to warrant the court, in the exercise of its discretion, to render a ruling in favor of the questionable testimony. The court must exercise this discretion with caution and reasonable strictness, and not so loosely as to infringe on the general rule, unless it reasonably appears that otherwise injustice will result, and therefore the exception rather than the rule should apply."

11. There is an additional special reason for doubt as to the admissibility of the

particular conversation here in question. The deposition of Jones discloses that when he had the claimed conversation with McFadyen, apparently at least more than a year after the exchange of letters between the parties in August and September, 1925, Jones saw McFadyen at a gasoline filling station across the street from the Rainbow Hotel in Shelby, Montana, and went over and talked to him. There is no evidence that McFadyen was transacting any business at the filling station or was then charged with the performance of any duties on behalf of Ohio. Apparently the statements sought to be testified to were merely a part of a street corner conversation and not a part of any transaction then in progress. If the statement then made by McFadyen was offered as a declaration or admission of an agent binding upon his principal, this particular conversation would be inadmissible under the rule stated in Rossberg v. Montgomery Ward & Co., 110 Mont. 154, 161, at pages 161–162, 99 P.2d 979, 981, as follows: "It is elemental that admissions or declarations of the officers or agents of private corporations are not admissible unless they are made while acting within the scope of their authority as a part of the res gestae relating to the present transactions. For still stronger reasons

■ This brings us to the conclusion that the finding by the trial court quoted above to the effect that in 1925 Ohio rejected the demand for changes in its charges and thereafter maintained a continuous and unvarying course of conduct under which it flatly and unequivocally refused to make any such change is sustained by the evidence and there is no competent evidence to the contrary. Even assuming that appellants are correct in their argument with respect to the existence of a trust relationship, positive notice of a rejection of appellant's claim was given by Ohio in 1925, and under the rule laid down in State ex rel. Central Auxiliary v. Rorabeck, supra, the statute of limitations had run long prior to the commencement of the action.

■ It is also apparent that if we adopt the theory of the appellants that their action is one in equity to enforce a trust, the action is barred by laches, as the trial court held. Appellants assert that the defense of laches is not available because no prejudice resulted from the delay. They cite certain cases said to establish the rule that the mere death of the witnesses who were present at the time of the making of the written agreement and who participated in its prior negotiations would not be sufficient to demonstrate the required prejudice. It is unnecessary to refer to those cases for the Montana rule is to the contrary. In Riley v. Blacker, 51 Mont. 364, 371, 152 P. 758, 760, the court said: "What constitutes a material change of condition has been the subject of much judicial discussion and some judicial dissension; but whatever doubt there may be as to other circumstances, it never has been questioned, to our knowledge, that the death of one of the parties to the transaction is such a change." The prejudice is the same

the statements of subordinate agents are not admissions on the part of the corporation, unless they constitute a part of the res gestae".

If the purpose of the conversation between Jones and McFadyen was to prove an agreement to modify the existing arrangement between the appellants and Ohio, there appears likewise to be a want of proof of McFadyen's authority to bind Ohio in this respect. The only evidence as to McFayden's authority is a stipulation that he was "Division Manager, Rocky Mountain Division". There is no evidence that he had any part in entering into the original contract between the Syndicate and Ohio, or that he had any part in the negotiations arising out of the dispute which led to the exchange of letters in August and September, 1925. The Operating Agreement itself was negotiated and executed on behalf of Ohio by one F. E. Hurley, a vice-president of Ohio. In the letter of September 12, 1925, previously mentioned, which was written in reply to the letter from appellants' attorneys, the writer explained that the reply had been delayed because "it was necessary that I await the arrival of Mr. Hurley from Findlay, Ohio in order that we might have a general conference about the entire matter", thus disclosing a view that Mr. Hurley was the person entrusted with the decision in this matter.

Earlier in 1923 Inland had written a letter to Hurley complaining about charges made under the lease in which the writer stated that Inland had expressed its understanding to Mr. McFadyen and Mr. Sellery "who advised us to take the matter up with you". On that occasion the reply, rejecting the complaints, came from Hurley. Hurley's headquarters were at Findlay, Ohio.

In Montana an agent clothed with management powers may transact only those items of corporation business which are "usual, proper, or necessary to be made in the ordinary transaction of the company's business." Electrical Prod. Consolidated v. El Campo Inc., 105 Mont. 386, 394, 73 P.2d 199, 203. Where a contract has initially been negotiated and signed by the company's vice-president, (Hurley was "vice-president in charge of land and property acquisition"), who has thereafter handled the negotiations relating to disputes over its construction, it would appear that an undertaking by a different and subordinate agent to modify that contract would be outside of "the ordinary transaction of the company's business." As stated by Judge Sanborn in Re American Range & Foundry Co., D.C., 14 F.2d 466, 468; "The general rule is that the power to modify a corporate contract is in the board of directors, and that no other officer or agent can make such modification, even though he has power to make the contract, unless authorized by the board of directors." Cf. Harbor Construction Co. v. Walters, 101 Cal.App. 470, 476, 281 P. 1062.

whether the participants in the transaction who have died are parties or agents of parties.

It has not been argued that viewing this as an action on the contract to recover damages, then each time an inadequate payment was made a new cause of action arose, and that since a number of such deficient payments were made in the eight years preceding the commencement of the action, appellants should be able to recover at least the amount of the deficiency on these. It is obvious that even if we were required to consider this point, not assigned or presented here, yet without the testimony of Jones mentioned in note 4 supra, there is no evidence of any such agreement as would stamp the charges made as not within the meaning of the contract. And Jones was just as incompetent to give that testimony as he was with respect to the McFadyen conversation. See note 5, supra. There remains only the fact that for years and years both parties by continued acquiescence, have given the written contract a practical construction which accords with that which the trial court has found its meaning to be.

As the conclusions to which we have thus arrived fully dispose of the appeal, we find it unnecessary to consider the other rulings of the trial court specified in appellant's assignments.

The judgment is affirmed.